Senior ARONSON, et al., Defendants
Below, Appellants,

v.

Harry LEWIS, Plaintiff Below, Appellee.

Supreme Court of Delaware.

Submitted: Nov. 14, 1983.

Decided: March 1, 1984.

William T. Quillen (argued), Robert K. Payson, Peter M. Sieglaff, Potter, Anderson & Corroon, Wilmington; and Allan M. Pepper, Michael D. Braff, Kaye, Scholer, Fierman, Hays & Handler, New York City, for appellants.

Joseph A. Rosenthal (argued), Morris & Rosenthal, P.A., Wilmington; and Irving Bizar, Pincus, Ohrenstein, Bizar, D'Alessandro & Solomon, New York City, for appellee.

Before McNEILLY, MOORE and CHRISTIE, JJ.

MOORE, Justice:

In the wake of *Zapata Corp. v. Maldonado,* Del.Supr., 430 A.2d 779 (1981), this Court left a crucial issue unanswered: when is a stockholder's demand upon a board of directors, to redress an alleged wrong to the corporation, excused as futile prior to the filing of a derivative suit? We granted this interlocutory appeal to the defendants, Meyers Parking System, Inc. (Meyers), a Delaware corporation, and its directors, to review the Court of Chancery's denial of their motion to dismiss this action, pursuant to Chancery Rule 23.1, for the

plaintiff's failure to make such a demand or otherwise demonstrate its futility.[1] The Vice Chancellor ruled that plaintiff's allegations raised a "reasonable inference" that the directors' action was unprotected by the business judgment rule. Thus, the board could not have impartially considered and acted upon the demand. See *Lewis v. Aronson,* Del.Ch., 466 A.2d 375, 381 (1983).

We cannot agree with this formulation of the concept of demand futility. In our view demand can only be excused where facts are alleged with particularity which create a reasonable doubt that the directors' action was entitled to the protections of the business judgment rule. Because the plaintiff failed to make a demand, and to allege facts with particularity indicating that such demand would be futile, we reverse the Court of Chancery and remand with instructions that plaintiff be granted leave to amend the complaint.

## I.

The issues of demand futility rest upon the allegations of the complaint. The plaintiff, Harry Lewis, is a stockholder of Meyers. The defendants are Meyers and its ten directors, some of whom are also company officers.

In 1979, Prudential Building Maintenance Corp. (Prudential) spun off its shares of Meyers to Prudential's stockholders. Prior thereto Meyers was a wholly owned subsidiary of Prudential. Meyers provides parking lot facilities and related services throughout the country. Its stock is actively traded over-the-counter.

This suit challenges certain transactions between Meyers and one of its directors, Leo Fink, who owns 47% of its outstanding stock. Plaintiff claims that these transactions were approved only because Fink personally selected each director and officer of Meyers.[2]

Prior to January 1, 1981, Fink had an employment agreement with Prudential which provided that upon retirement he was to become a consultant to that company for ten years. This provision became operable when Fink retired in April 1980.[3] Thereafter, Meyers agreed with Prudential to share Fink's consulting services and reimburse Prudential for 25% of the fees paid Fink. Under this arrangement Meyers paid Prudential $48,332 in 1980 and $45,832 in 1981.

On January 1, 1981, the defendants approved an employment agreement between Meyers and Fink for a five year term with provision for automatic renewal each year thereafter, indefinitely. Meyers agreed to pay Fink $150,000 per year, plus a bonus of 5% of its pre-tax profits over $2,400,000. Fink could terminate the contract at any time, but Meyers could do so only upon six months' notice. At termination, Fink was to become a consultant to Meyers and be paid $150,000 per year for the first three years, $125,000 for the next three years, and $100,000 thereafter for life. Death benefits were also included. Fink agreed to devote his best efforts and substantially his entire business time to advancing Meyers' interests. The agreement also provided

1. Chancery Rule 23.1, similar to Fed.R.Civ.P. 23.1, provides in pertinent part:

    In a derivative action brought by 1 or more shareholders or members to enforce a right of a corporation or of an unincorporated association, the corporation or association having failed to enforce a right which may properly be asserted by it, the complaint shall allege that the plaintiff was a shareholder or member at the time of the transaction of which he complains or that his share of membership thereafter devolved on him by operation of law. The complaint *shall* also *allege with particularity* the efforts, if any, made by the plaintiff to *obtain the* action he desires from the directors

or comparable authority *and the reasons for his failure to obtain the action or for not making the effort.* Del.Ch.Ct.R. 23.1 (Emphasis added).

2. The Court of Chancery stated that Fink had been chief executive officer of Prudential prior to the spin-off and thereafter became chairman of Meyers' board. This was not alleged in the complaint. *Lewis,* 466 A.2d at 379.

3. The trial court stated that Fink "changed his status with Prudential building from employee to consultant". *Lewis,* 466 A.2d at 379.

that Fink's compensation was not to be affected by any inability to perform services on Meyers' behalf. Fink was 75 years old when his employment agreement with Meyers was approved by the directors. There is no claim that he was, or is, in poor health.

Additionally, the Meyers board approved and made interest-free loans to Fink totalling $225,000. These loans were unpaid and outstanding as of August 1982 when the complaint was filed. At oral argument defendants' counsel represented that these loans had been repaid in full.

The complaint charges that these transactions had "no valid business purpose", and were a "waste of corporate assets" because the amounts to be paid are "grossly excessive", that Fink performs "no or little services", and because of his "advanced age" cannot be "expected to perform any such services". The plaintiff also charges that the existence of the Prudential consulting agreement with Fink prevents him from providing his "best efforts" on Meyers' behalf. Finally, it is alleged that the loans to Fink were in reality "additional compensation" without any "consideration" or "benefit" to Meyers.

The complaint alleged that no demand had been made on the Meyers board because:

13. ... such attempt would be futile for the following reasons:

(a) All of the directors in office are named as defendants herein and they have participated in, expressly approved and/or acquiesced in, and are personally liable for, the wrongs complained of herein.

(b) Defendant Fink, having selected each director, controls and dominates every member of the Board and every officer of Meyers.

(c) Institution of this action by present directors would require the defendant-directors to sue themselves, thereby placing the conduct of this ac-

tion in hostile hands and preventing its effective prosecution.

Complaint, at ¶ 13.

The relief sought included the cancellation of the Meyers-Fink employment contract and an accounting by the directors, including Fink, for all damage sustained by Meyers and for all profits derived by the directors and Fink.

## II.

Defendants moved to dismiss for plaintiff's failure to make demand on the Meyers board prior to suit, or to allege with factual particularity why demand is excused. See Del.Ch.Ct.R. 23.1, supra.

After recounting the allegations, the trial judge noted that the demand requirement of Rule 23.1 is a rule of substantive right designed to give a corporation the opportunity to rectify an alleged wrong without litigation, and to control any litigation which does arise. Lewis, 466 A.2d at 380. According to the Vice Chancellor, the test of futility is "whether the Board, at the time of the filing of the suit, could have impartially considered and acted upon the demand". Id. at 381.

As part of this formulation, the trial judge stated that interestedness is one factor affecting impartiality, and indicated that the business judgment rule is a potential defense to allegations of director interest, and hence, demand futility. Id. However, the court observed that to establish demand futility, a plaintiff need not allege that the challenged transaction could never be deemed a product of business judgment. Id. Rather, the Vice Chancellor maintained that a plaintiff "must only allege facts which, if true, show that there is a reasonable inference that the business judgment rule is not applicable for purposes of considering a pre-suit demand pursuant to Rule 23.1". Id. The court concluded that this transaction permitted such an inference. Id. at 384–86.

Upon these formulations, the Court of Chancery addressed the plaintiff's argu-

ments as to the futility of demand. *Id.* at 381–84. The trial judge correctly noted that futility is gauged by the circumstances existing at the commencement of a derivative suit. This disposed of plaintiff's argument that defendants' motion to dismiss established board hostility and the futility of demand. *Id.* at 381.

The Vice Chancellor then dealt with plaintiff's contention that Fink, as a 47% shareholder of Meyers, dominated and controlled each director, thereby making demand futile. *Id.* at 381–83. Plaintiff also argued that Fink's interest, when combined with the shareholdings of four other defendants, amounted to 57.5% of Meyers' outstanding shares. *Id.* at 381. After noting the presumptions under the business judgment rule that a board's actions are taken in good faith and in the best interests of the corporation, the Court of Chancery ruled that mere board approval of a transaction benefiting a substantial, but non-majority, shareholder will not overcome the presumption of propriety. *Id.* at 382. Specifically, the court observed that:

> A plaintiff, to properly allege domination of the Board, particularly domination based on ownership of less than a majority of the corporation's stock, in order to excuse a pre-suit demand, must allege ownership plus other facts evidencing control to demonstrate that the Board could not have exercised its independent business judgment.

*Id.*

As to the combined 57.5% control claim, the court stated that there were no factual allegations regarding the alignment of the four directors with Fink, such as a claim that they were beneficiaries of the Meyers-Fink agreement. *Id.* at 382, 383. Because it was not alleged in the complaint, the court rejected plaintiff's argument that, as evidence of alignment with Fink, two of the directors have "similar" compensation agreements with Meyers. *Id.* at 383.

Turning to plaintiff's allegations of board approval, participation in, and/or acquiescence in the wrong, the trial court focused on the underlying transaction to determine whether the board's action was wrongful and not protected by the business judgment rule. *Id.* [citing *Dann v. Chrysler,* Del.Ch., 174 A.2d 696 (1961) ]. The Vice Chancellor indicated that if the underlying transaction supported a reasonable inference that the business judgment rule did not apply, then the directors who approved the transaction were potentially liable for a breach of their fiduciary duty, and thus, could not impartially consider a stockholder's demand. *Id.*

The trial court then stated that board approval of the Meyers-Fink agreement, allowing Fink's consultant compensation to remain unaffected by his ability to perform any services, may have been a transaction wasteful on its face. *Id.* [citing *Fidanque v. American Maracaibo Co.,* Del.Ch., 92 A.2d 311 (1952) ]. Consequently, demand was excused as futile, because the Meyers' directors faced potential liability for waste and could not have impartially considered the demand. *Id.* at 384.

### III.

The defendants make two arguments, one policy-oriented and the other, factual. First, they assert that the demand requirement embraces the policy that directors, rather than stockholders, manage the affairs of the corporation. They contend that this fundamental principle requires the strict construction and enforcement of Chancery Rule 23.1. Second, the defendants point to four of plaintiff's basic allegations and argue that they lack the factual particularity necessary to excuse demand. Concerning the allegation that Fink dominated and controlled the Meyers board, the defendants point to the absence of any facts explaining how he "selected each director". With respect to Fink's 47% stock interest, the defendants say that absent other facts this is insufficient to indicate domination and control. Regarding the claim of hostility to the plaintiff's suit, because defendants would have to sue themselves, the latter assert that this bootstrap argument ignores the possibility that the directors have other

alternatives, such as cancelling the challenged agreement. As for the allegation that directorial approval of the agreement excused demand, the defendants reply that such a claim is insufficient, because it would obviate the demand requirement in almost every case. The effect would be to subvert the managerial power of a board of directors. Finally, as to the provision guaranteeing Fink's compensation, even if he is unable to perform any services, the defendants contend that the trial court read this out of context. Based upon the foregoing, the defendants conclude that the plaintiff's allegations fall far short of the factual particularity required by Rule 23.1.

## IV.

### A.

--- [2, 3] A cardinal precept of the General Corporation Law of the State of Delaware is that directors, rather than shareholders, manage the business and affairs of the corporation. 8 *Del.C.* § 141(a). Section 141(a) states in pertinent part:

"The *business and affairs* of a corporation organized under this chapter *shall be managed by or under the direction* of a board of directors except as may be oth-

erwise provided in this chapter or in its certificate of incorporation."

8 *Del.C.* § 141(a) (Emphasis added). The existence and exercise of this power carries with it certain fundamental fiduciary obligations to the corporation and its shareholders.[4] *Loft, Inc. v. Guth,* Del.Ch., 2 A.2d 225 (1938), *aff'd,* Del.Supr., 5 A.2d 503 (1939). Moreover, a stockholder is not powerless to challenge director action which results in harm to the corporation. The machinery of corporate democracy and the derivative suit are potent tools to redress the conduct of a torpid or unfaithful management. The derivative action developed in equity to enable shareholders to sue in the corporation's name where those in control of the company refused to assert a claim belonging to it. The nature of the action is two-fold. First, it is the equivalent of a suit by the shareholders to compel the corporation to sue. Second, it is a suit by the corporation, asserted by the shareholders on its behalf, against those liable to it.

By its very nature the derivative action impinges on the managerial freedom of directors.[5] Hence, the demand requirement of Chancery Rule 23.1 exists at the threshold, first to insure that a stockholder exhausts his intracorporate remedies, and

4. The broad question of structuring the modern corporation in order to satisfy the twin objectives of managerial freedom of action and responsibility to shareholders has been extensively debated by commentators. *See, e.g.,* Fischel, The Corporate Governance Movement, 35 Vand.L.Rev. 1259 (1982); Dickstein, Corporate Governance and the Shareholders' Derivative Action: Rules and Remedies for Implementing the Monitoring Model, 3 Cardozo L.Rev. 627 (1982); Haft, Business Decisions by the New Board: Behavioral Science and Corporate Law, 80 Mich.L.Rev. 1 (1981); Dent, The Revolution in Corporate Governance, The Monitoring Board, and The Director's Duty of Care, 61 B.U.L.Rev. 623 (1981); Moore, Corporate Officer & Director Liability: Is Corporate Behavior Beyond the Control of Our Legal System? 16 Capital U.L.Rev. 69 (1980); Jones, Corporate Governance: Who Controls the Large Corporation? 30 Hastings L.J. 1261 (1979); Small, The Evolving Role of the Director in Corporate Governance, 30 Hastings L.J. 1353 (1979).

5. Like the broader question of corporate governance, the derivative suit, its value, and the

methods employed by corporate boards to deal with it have received much attention by commentators. *See, e.g.,* Brown, Shareholder Derivative Litigation and the Special Litigation Committee, 43 U.Pitt.L.Rev. 601 (1982); Coffee and Schwartz, The Survival of the Derivative Suit: An Evaluation and a Proposal for Legislative Reform, 81 Colum.L.Rev. 261 (1981); Shnell, A Procedural Treatment of Derivative Suit Dismissals by Minority Directors, 609 Calif.L.Rev. 885 (1981); Dent, The Power of Directors to Terminate Shareholder Litigation: The Death of the Derivative Suit? 75 N.W.U.L. Rev. 96 (1980); Jones, An Empirical Examination of the Incidence of Shareholder Derivative and Class Action Lawsuits, 1971–1978, 60 B.U. L.Rev. 306 (1980); Comment, The Demand and Standing Requirements in Stockholder Derivative Actions, 44 U.Chi.L.Rev. 168 (1976); Dykstra, The Revival of the Derivative Suit, 116 U.Pa.L.Rev. 74 (1967); Note, Demand on Directors and Shareholders as a Prerequisite to a Derivative Suit, 73 Harv.L.Rev. 729 (1960).

then to provide a safeguard against strike suits. Thus, by promoting this form of alternate dispute resolution, rather than immediate recourse to litigation, the demand requirement is a recognition of the fundamental precept that directors manage the business and affairs of corporations.

In our view the entire question of demand futility is inextricably bound to issues of business judgment and the standards of that doctrine's applicability. The business judgment rule is an acknowledgment of the managerial prerogatives of Delaware directors under Section 141(a). See *Zapata Corp. v. Maldonado,* 430 A.2d at 782. It is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company. *Kaplan v. Centex Corp.,* Del.Ch., 284 A.2d 119, 124 (1971); *Robinson v. Pittsburgh Oil Refinery Corp.,* Del.Ch., 126 A. 46 (1924). Absent an abuse of discretion, that judgment will be respected by the courts. The burden is on the party challenging the decision to establish facts rebutting the presumption. See *Puma v. Marriott,* Del.Ch., 283 A.2d 693, 695 (1971).

The function of the business judgment rule is of paramount significance in the context of a derivative action. It comes into play in several ways—in addressing a demand, in the determination of demand futility, in efforts by independent disinterested directors to dismiss the action as inimical to the corporation's best interests, and generally, as a defense to the merits of the suit. However, in each of these circumstances there are certain common principles governing the application and operation of the rule.

First, its protections can only be claimed by disinterested directors whose conduct otherwise meets the tests of business judgment. From the standpoint of interest, this means that directors can neither appear on both sides of a transaction nor expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally. *Sinclair Oil Corp. v. Levien,* Del.Supr., 280 A.2d 717, 720 (1971); *Cheff v. Mathes,* Del.Supr., 199 A.2d 548, 554 (1964); *David J. Greene & Co. v. Dunhill International, Inc.,* Del.Ch., 249 A.2d 427, 430 (1968). See also 8 *Del.C.* § 144. Thus, if such director interest is present, and the transaction is not approved by a majority consisting of the disinterested directors, then the business judgment rule has no application whatever in determining demand futility. See 8 *Del.C.* § 144(a)(1).

Second, to invoke the rule's protection directors have a duty to inform themselves, prior to making a business decision, of all material information reasonably available to them. Having become so informed, they must then act with requisite care in the discharge of their duties. While the Delaware cases use a variety of terms to describe the applicable standard of care, our analysis satisfies us that under the business judgment rule director liability is predicated upon concepts of gross negligence.[6] See Veasey & Manning, *Codified Stan-*

---

**6.** While the Delaware cases have not been precise in articulating the standard by which the exercise of business judgment is governed, a long line of Delaware cases holds that director liability is predicated on a standard which is less exacting than simple negligence. *Sinclair Oil Corp. v. Levien,* Del.Supr., 280 A.2d 717, 722 (1971), *rev'g,* Del.Ch., 261 A.2d 911 (1969) ("fraud or gross overreaching"); *Getty Oil Co. v. Skelly Oil Co.,* Del.Supr., 267 A.2d 883, 887 (1970), *rev'g,* Del.Ch., 255 A.2d 717 (1969) ("gross and palpable overreaching"); *Warshaw v. Calhoun,* Del.Supr., 221 A.2d 487, 492–93

(1966) ("bad faith ... or a gross abuse of discretion"); *Moskowitz v. Bantrell,* Del.Supr., 190 A.2d 749, 750 (1963) ("fraud or gross abuse of discretion"); *Penn Mart Realty Co. v. Becker,* Del.Ch., 298 A.2d 349, 351 (1972) ("directors may breach their fiduciary duty ... by being grossly negligent"); *Kors v. Carey,* Del.Ch., 158 A.2d 136, 140 (1960) ("fraud, misconduct or abuse of discretion"); *Allaun v. Consolidated Oil Co.,* Del.Ch., 147 A. 257, 261 (1929) ("reckless indifference to or a deliberate disregard of the stockholders").

*dard—Safe Harbor or Uncharted Reef?* 35 Bus.Law. 919, 928 (1980).

However, it should be noted that the business judgment rule operates only in the context of director action. Technically speaking, it has no role where directors have either abdicated their functions, or absent a conscious decision, failed to act.[7] But it also follows that under applicable principles, a conscious decision to refrain from acting may nonetheless be a valid exercise of business judgment and enjoy the protections of the rule.

The gap in our law, which we address today, arises from this Court's decision in *Zapata Corp. v. Maldonado*. There, the Court defined the limits of a board's managerial power granted by Section 141(a) and restricted application of the business judgment rule in a factual context similar to this action. *Zapata Corp. v. Maldonado,* 430 A.2d at 782–86, *rev'g, Maldonado v. Flynn,* Del.Ch., 413 A.2d 1251 (1980).

By way of background, this Court's review in *Zapata* was limited to whether an independent investigation committee of disinterested directors had the *power* to cause the derivative action to be dismissed. Preliminarily, it was noted in *Zapata* that "[d]irectors of Delaware corporations derive their managerial decision making power, which encompasses decisions whether to initiate, or refrain from entering, litigation, from 8 *Del.C.* § 141(a)". *Zapata,* 430 A.2d at 782 (footnotes omitted). In that context, this Court observed that the business judgment rule has no relevance to corporate decision making until *after a decision has been made. Id.* In *Zapata,* we stated that a shareholder does not possess an independent individual right to continue a derivative action. Moreover, where demand on a board has been made and refused, we apply the business judgment rule in reviewing the board's refusal to act pursuant to a stock-

holder's demand. *Id.* at 784 & n. 10. Unless the business judgment rule does not protect the refusal to sue, the shareholder lacks the legal managerial power to continue the derivative action, since that power is terminated by the refusal. *Id.* at 784. We also concluded that where demand is excused a shareholder possesses the ability to initiate a derivative action, but the right to prosecute it may be terminated upon the exercise of applicable standards of business judgment. *Id.* The thrust of *Zapata* is that in either the demand-refused or the demand-excused case, the board still retains its Section 141(a) managerial authority to make decisions regarding corporate litigation. Moreover, the board may delegate its managerial authority to a committee of independent disinterested directors. *Id.* at 786. See 8 *Del.C.* § 141(c). Thus, even in a demand-excused case, a board has the power to appoint a committee of one or more independent disinterested directors to determine whether the derivative action should be pursued or dismissal sought. *Zapata,* 430 A.2d at 786. Under *Zapata,* the Court of Chancery, in passing on a committee's motion to dismiss a derivative action in a demand excused case, must apply a two-step test. First, the court must inquire into the independence and good faith of the committee and review the reasonableness and good faith of the committee's investigation. *Id.* at 788. Second, the court must apply its own independent business judgment to decide whether the motion to dismiss should be granted. *Id.* at 789.

After *Zapata* numerous derivative suits were filed without prior demand upon boards of directors. The complaints in such actions all alleged that demand was excused because of board interest, approval or acquiescence in the wrongdoing. In any event, the *Zapata* demand-excused/de-

---

**7.** Although questions of director liability in such cases have been adjudicated upon concepts of business judgment, they do not in actuality present issues of business judgment. See *Graham v. Allis-Chalmers Manufacturing Co.,* Del.Supr., 188 A.2d 125 (1963); *Kelly v.* *Bell,* Del.Ch., 254 A.2d 62 (1969), *aff'd,* Del. Supr., 266 A.2d 878 (1970); *Lutz v. Boas,* Del. Ch., 171 A.2d 381 (1961). See also Arsht, *Fiduciary Responsibilities of Directors, Officers & Key Employees,* 4 Del.J.Corp.L. 652, 659 (1979).

mand-refused bifurcation, has left a crucial issue unanswered: when is demand futile and, therefore, excused?

■ Delaware courts have addressed the issue of demand futility on several earlier occasions. *See Sohland v. Baker,* Del. Supr., 141 A. 277, 281–82 (1927); *McKee v. Rogers,* Del.Ch., 156 A. 191, 193 (1931); *Miller v. Loft,* Del.Ch., 153 A. 861, 862 (1931); *Fleer v. Frank H. Fleer Corp.,* Del.Ch., 125 A. 411, 414 (1924); *Harden v. Eastern States Public Service Co.,* Del.Ch., 122 A. 705, 707 (1923); *Ellis v. Penn Beef Co.,* Del.Ch., 80 A. 666, 668 (1911). *Cf. Mayer v. Adams,* Del.Supr., 141 A.2d 458, 461 (1958) (minority demand on majority shareholders). The rule emerging from these decisions is that where officers and directors are under an influence which sterilizes their discretion, they cannot be considered proper persons to conduct litigation on behalf of the corporation. Thus, demand would be futile. *See, e.g., McKee v. Rogers,* Del.Ch., 156 A. 191, 192 (1931) (holding that where a defendant controlled the board of directors, "[i]t is manifest then that there can be no expectation that the corporation would sue him, and if it did, it can hardly be said that the prosecution of the suit would be entrusted to proper hands"). *But see, e.g., Fleer v. Frank H. Fleer Corp.,* Del.Ch., 125 A. 411, 415 (1924) ("[w]here the demand if made would be directed to the particular individuals who themselves are the alleged wrongdoers and who therefore would be invited to sue themselves, the rule is settled that a demand and refusal is not requisite"); *Miller v. Loft, Inc.,* Del.Ch., 153 A. 861, 862 (1931) ("if by reason of hostile interest or guilty participation in the wrongs complained of, the directors cannot be expected to institute suit, . . . no demand upon them to institute suit is requisite").

■ However, those cases cannot be taken to mean that any board approval of a challenged transaction automatically connotes "hostile interest" and "guilty participation" by directors, or some other form of sterilizing influence upon them. Were that

so, the demand requirements of our law would be meaningless, leaving the clear mandate of Chancery Rule 23.1 devoid of its purpose and substance.

The trial court correctly recognized that demand futility is inextricably bound to issues of business judgment, but stated the test to be based on allegations of fact, which, if true, "show that there is a reasonable inference" the business judgment rule is not applicable for purposes of a pre-suit demand. *Lewis,* 466 A.2d at 381.

The problem with this formulation is the concept of reasonable inferences to be drawn against a board of directors based on allegations in a complaint. As is clear from this case, and the conclusory allegations upon which the Vice Chancellor relied, demand futility becomes virtually automatic under such a test. Bearing in mind the presumptions with which director action is cloaked, we believe that the matter must be approached in a more balanced way.

■ Our view is that in determining demand futility the Court of Chancery in the proper exercise of its discretion must decide whether, under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment. Hence, the Court of Chancery must make two inquiries, one into the independence and disinterestedness of the directors and the other into the substantive nature of the challenged transaction and the board's approval thereof. As to the latter inquiry the court does not assume that the transaction is a wrong to the corporation requiring corrective steps by the board. Rather, the alleged wrong is substantively reviewed against the factual background alleged in the complaint. As to the former inquiry, directorial independence and disinterestedness, the court reviews the factual allegations to decide whether they raise a reasonable doubt, as a threshold matter, that the protections of the business judgment rule are available to the board.

Certainly, if this is an "interested" director transaction, such that the business judgment rule is inapplicable to the board majority approving the transaction, then the inquiry ceases. In that event futility of demand has been established by any objective or subjective standard.[8] *See, e.g., Bergstein v. Texas Internat'l Co.,* Del.Ch., 453 A.2d 467, 471 (1982) (because five of nine directors approved stock appreciation rights plan likely to benefit them, board was interested for demand purposes and demand held futile). This includes situations involving self-dealing directors. *See Sinclair Oil Corp. v. Levien,* Del.Supr., 280 A.2d 717 (1971); *Sterling v. Mayflower,* Del.Supr., 93 A.2d 107 (1952); *Trans World Airlines, Inc. v. Summa Corp.,* Del.Ch., 374 A.2d 5 (1977); *David J. Greene & Co. v. Dunhill International, Inc.,* Del.Ch., 249 A.2d 427 (1968).

■ However, the mere threat of personal liability for approving a questioned transaction, standing alone, is insufficient to challenge either the independence or disinterestedness of directors, although in rare cases a transaction may be so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability therefore exists. *See Gimbel v. Signal Cos., Inc.,* Del.Ch., 316 A.2d 599, *aff'd,* Del.Supr., 316 A.2d 619 (1974); *Cottrell v. Pawcatuck Co.,* Del.Supr., 128 A.2d 225 (1956). In sum the entire review is factual in nature. The Court of Chancery in the exercise of its sound discretion must be satisfied that a plaintiff has alleged facts with particularity which, taken as true, support a reasonable doubt that the challenged transaction was the product of a valid exercise of business judgment. Only in that context is demand excused.

B.

Having outlined the legal framework within which these issues are to be determined, we consider plaintiff's claims of futility here: Fink's domination and control of the directors, board approval of the Fink-Meyers employment agreement, and board hostility to the plaintiff's derivative action due to the directors' status as defendants.

■ Plaintiff's claim that Fink dominates and controls the Meyers' board is based on: (1) Fink's 47% ownership of Meyers' outstanding stock, and (2) that he "personally selected" each Meyers director. Plaintiff also alleges that mere approval of the employment agreement illustrates Fink's domination and control of the board. In addition, plaintiff argued on appeal that 47% stock ownership, though less than a majority, constituted control given the large number of shares outstanding, 1,245,-745.

■ Such contentions do not support any claim under Delaware law that these directors lack independence. In *Kaplan v. Centex Corp.,* Del.Ch., 284 A.2d 119 (1971), the Court of Chancery stated that "[s]tock ownership alone, at least when it amounts to less than a majority, is not sufficient proof of domination or control". *Id.* at 123. Moreover, in the demand context even proof of majority ownership of a company does not strip the directors of the presumptions of independence, and that their acts have been taken in good faith and in the best interests of the corporation. There must be coupled with the allegation of control such facts as would demonstrate that through personal or other relationships the directors are beholden to the controlling person. *See Mayer v. Adams,* Del.Ch., 167 A.2d 729, 732, *aff'd,* Del.Supr., 174 A.2d 313 (1961). To date the principal decisions deal-

---

**8.** We recognize that drawing the line at a majority of the board may be an arguably arbitrary dividing point. Critics will charge that we are ignoring the structural bias common to corporate boards throughout America, as well as the other unseen socialization processes cutting against independent discussion and decisionmaking in the boardroom. The difficulty with structural bias in a demand futile case is simply one of establishing it in the complaint for purposes of Rule 23.1. We are satisfied that discretionary review by the Court of Chancery of complaints alleging specific facts pointing to bias on a particular board will be sufficient for determining demand futility.

ing with the issue of control or domination arose only after a full trial on the merits. Thus, they are distinguishable in the demand context unless similar particularized facts are alleged to meet the test of Chancery Rule 23.1. *See e.g., Kaplan,* 284 A.2d at 123; *Chasin v. Gluck,* Del.Ch., 282 A.2d 188 (1971); *Greene v. Allen,* Del.Ch., 114 A.2d 916 (1955); *Loft, Inc. v. Guth,* Del.Ch., 2 A.2d 225, 237 (1938), *aff'd,* Del.Supr., 5 A.2d 503 (1939).

The requirement of director independence inhers in the conception and rationale of the business judgment rule. The presumption of propriety that flows from an exercise of business judgment is based in part on this unyielding precept. Independence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences. While directors may confer, debate, and resolve their differences through compromise, or by reasonable reliance upon the expertise of their colleagues and other qualified persons, the end result, nonetheless, must be that each director has brought his or her own informed business judgment to bear with specificity upon the corporate merits of the issues without regard for or succumbing to influences which convert an otherwise valid business decision into a faithless act.

Thus, it is not enough to charge that a director was nominated by or elected at the behest of those controlling the outcome of a corporate election. That is the usual way a person becomes a corporate director. It is the care, attention and sense of individual responsibility to the performance of one's duties, not the method of election, that generally touches on independence.

We conclude that in the demand-futile context a plaintiff charging domination and control of one or more directors must allege particularized facts manifesting "a direction of corporate conduct in such a way as to comport with the wishes or interests of the corporation (or persons) doing the controlling". *Kaplan,* 284 A.2d at 123. The shorthand shibboleth of "dominated and controlled directors" is insufficient. In recognizing that *Kaplan* was decided after trial and full discovery, we stress that the plaintiff need only allege specific facts; he need not plead evidence. Otherwise, he would be forced to make allegations which may not comport with his duties under Chancery Rule 11.[9]

Here, plaintiff has not alleged any facts sufficient to support a claim of control. The personal-selection-of-directors allegation stands alone, unsupported. At best it is a conclusion devoid of factual support. The causal link between Fink's control and approval of the employment agreement is alluded to, but nowhere specified. The director's approval, alone, does not establish control, even in the face of Fink's 47% stock ownership. *See Kaplan v. Centex Corp.,* 284 A.2d at 122, 123. The claim that Fink is unlikely to perform any services under the agreement, because of his age, and his conflicting consultant work with Prudential, adds nothing to the control claim.[10] Therefore, we cannot conclude that the

---

9. Chancery Rule 11 provides:

Every pleading of a party represented by an attorney shall be signed by at least 1 attorney of record in his individual name, whose address shall be stated. A party who is not represented by an attorney shall sign his pleading and state his address. Except when otherwise specifically provided by statute or rule, pleadings need not be verified or accompanied by affidavit. The signature of an attorney constitutes a certificate by him that he has read the pleading; that to the best of his knowledge, information, and belief there is good ground to support it; and that it is not interposed for delay. If a pleading is not signed or is signed with intent to defeat the purpose of this rule, it may be stricken as sham and false and the action may proceed as though the pleading had not been served. For a willful violation of this rule an attorney may be subjected to appropriate disciplinary action. Similar action may be taken if scandalous or indecent matter is inserted. Del.Ch.Ct.R. 11.

10. Plaintiff made no legal argument that the "best efforts" provision of the agreement prohibited dual consultant duties, thereby demonstrating that the contract's approval evidenced control or was otherwise wrongful.

complaint factually particularizes any circumstances of control and domination to overcome the presumption of board independence, and thus render the demand futile.

### C.

Turning to the board's approval of the Meyers-Fink employment agreement, plaintiff's argument is simple: all of the Meyers directors are named defendants, because they approved the wasteful agreement; if plaintiff prevails on the merits all the directors will be jointly and severally liable; therefore, the directors' interest in avoiding personal liability automatically and absolutely disqualifies them from passing on a shareholder's demand.

■ Such allegations are conclusory at best. In Delaware mere directorial approval of a transaction, absent particularized facts supporting a breach of fiduciary duty claim, or otherwise establishing the lack of independence or disinterestedness of a majority of the directors, is insufficient to excuse demand.[11] Here, plaintiff's suit is premised on the notion that the Meyers-Fink employment agreement was a waste of corporate assets. So, the argument goes, by approving such waste the directors now face potential personal liability, thereby rendering futile any demand on them to bring suit. Unfortunately, plaintiff's claim falls in its initial premise. The complaint does not allege particularized facts indicating that the agreement is a waste of corporate assets. Indeed, the complaint as now drafted may not even state a cause of action, given the directors' broad corporate power to fix the compensation of officers.[12]

In essence, the plaintiff alleged a lack of consideration flowing from Fink to Meyers, since the employment agreement provided that compensation was not contingent on Fink's ability to perform any services. The bare assertion that Fink performed "little or no services" was plaintiff's conclusion based solely on Fink's age and the *existence* of the Fink-Prudential employment agreement. As for Meyers' loans to Fink, beyond the bare allegation that they were made, the complaint does not allege facts indicating the wastefulness of such arrangements. Again, the mere existence of such loans, given the broad corporate powers conferred by Delaware law, does not even state a claim.[13]

■ In sustaining plaintiff's claim of demand futility the trial court relied on *Fidanque v. American Maracaibo Co.,* Del. Ch., 92 A.2d 311, 321 (1952), which held that a contract providing for payment of consulting fees to a retired president/director was a waste of corporate assets. *Id.* In *Fidanque,* the court found after trial that the contract and payments were in reality compensation for past services. *Id.* at 320. This was based upon facts not present here: the former president/director was a 70 year old stroke victim, neither the agreement nor the record spelled out his consulting duties at all, the consulting salary equalled the individual's salary when he was president and general manager of the corporation, and the contract was silent as to continued employment in the event that the retired president/director again became incapacitated and unable to perform his duties. *Id.* at 320–21. Contrasting the facts of *Fidanque* with the complaint here, it is apparent that plaintiff has not alleged

---

11. See also *In re Kauffman Mutual Fund Actions,* 479 F.2d 257, 265 (1st Cir.1973); *Greenspun v. Del E. Webb,* 634 F.2d 1204, 1210 (9th Cir.1980); *Grossman v. Johnson,* 674 F.2d 115, 124 (1st Cir.1982); *Lewis v. Curtis,* 671 F.2d 779, 785 (3d Cir.1982); *Lewis v. Graves,* 701 F.2d 245, 248 (2d Cir.1983).

12. 8 *Del.C.* § 122(5) provides that "[e]very corporation created under this chapter shall have the power to appoint such officers and agents

as the business of the corporation requires and to pay or otherwise provide for them suitable compensation". 8 *Del.C.* § 122(5).

13. Plaintiff's allegation ignores 8 *Del.C.* § 143 which expressly authorizes interest-free loans to "any officer or employee of the corporation ... whenever, in the judgment of the directors, such loan ... may reasonably be expected to benefit the corporation." 8 *Del.C.* § 143.

facts sufficient to render demand futile on a charge of corporate waste, and thus create a reasonable doubt that the board's action is protected by the business judgment rule. *Cf. Beard v. Elster,* Del.Supr., 160 A.2d 731 (1960); *Lieberman v. Koppers Company Line, Inc.,* Del.Ch., 149 A.2d 756, *aff'd, Lieberman v. Becker,* Del.Supr., 155 A.2d 596 (1959).

### D.

■ Plaintiff's final argument is the incantation that demand is excused because the directors otherwise would have to sue themselves, thereby placing the conduct of the litigation in hostile hands and preventing its effective prosecution. This bootstrap argument has been made to and dismissed by other courts. *See, e.g., Lewis v. Graves,* 701 F.2d 245, 248–49 (2d Cir.1983); *Heit v. Baird,* 567 F.2d 1157, 1162 (1st Cir. 1977); *Lewis v. Anselmi,* 564 F.Supp., 768, 772 (S.D.N.Y.1983). Its acceptance would effectively abrogate Rule 23.1 and weaken the managerial power of directors. Unless facts are alleged with particularity to overcome the presumptions of independence and a proper exercise of business judgment, in which case the directors could not be expected to sue themselves, a bare claim of this sort raises no legally cognizable issue under Delaware corporate law.

### V.

In sum, we conclude that the plaintiff has failed to allege facts with particularity indicating that the Meyers directors were tainted by interest, lacked independence, or took action contrary to Meyers' best interests in order to create a reasonable doubt as to the applicability of the business judgment rule. Only in the presence of such a reasonable doubt may a demand be deemed futile. Hence, we reverse the Court of Chancery's denial of the motion to dismiss, and remand with instructions that plaintiff be granted leave to amend his complaint to bring it into compliance with Rule 23.1 based on the principles we have announced today.

\* \* \*

REVERSED AND REMANDED.