■ MARK FOSTER et al., Appellants-Respondents, v RICHARD H. CHURCHILL, JR., et al., Respondents-Appellants, et al., Defendants. [626 NYS2d 115] —Judgment, Supreme Court, New York County (Jane S. Solomon, J.), entered July 18, 1994, which, after a nonjury trial, dismissed the complaint against the nonsettling defendants, unanimously affirmed, without costs and disbursements. Appeals from the oral fact finding of the same court and Justice, read into the record on June 16, 1994, upon which the judgment is based, and from an order of the same court (Francis N. Pecora, J.), entered June 14, 1990, dismissed as subsumed in the appeal from the judgment, without costs.

Plaintiffs Mark Foster and Don Franco are the founders and

former chief executive officers of defendant Microband Companies Incorporated, which is engaged in the wireless cable television business. Defendants-respondents herein, collectively referred to as the TA defendants, are various venture capital funds and their managers. Although plaintiffs had, at some point, sold the company that they established, remaining as its chief executive officers, they sought to purchase back the business in 1985, and the TA defendants supplied the required financing. Despite Microband's highly leveraged condition, the company expanded rapidly, and considerable new capital became necessary. In November 1987, Microband assumed added debt when the New York Life Insurance defendants, who are not involved in this appeal, loaned the company approximately $25 million.

At the time of the refinancing, a shareholders' agreement was entered into between plaintiffs, the TA defendants, the New York Life defendants and certain purchasers of securities placed by Drexel Burnham Lambert. This contract provided that the Board of Directors of Microband would consist of seven members, two of whom would be designated by the TA defendants. While the infusion of money did enable Microband to construct a new multi-channel cable system, additional funds were soon needed, and, in 1989, both the New York Life and TA defendants supplied more money. Plaintiffs' amended employment contracts, executed on June 9, 1989, authorized substantial increases in compensation and benefits for them, and extended their terms of office to December 31, 1992. Pursuant to these agreements, Microband, upon a majority vote of the Board, had the right to terminate plaintiffs' employment at any time and for any reason, but in the event that Microband were to dispense with plaintiffs' services "other than due to [their] death, disability, breach of this agreement or for cause," they would be given an extremely generous severance package. On the other hand, "[i]f the Company shall validly terminate the Executive[s'] employment for cause, [they] shall not be entitled to any further payments under this agreement, including salary, bonus or severance payments."

Notwithstanding the injection of the additional capital, the company, due to its rapid expansion and its need to service the existing debt, shortly required additional financing. However, as a result of its already highly leveraged state, Microband experienced great difficulty in raising the mandatory funding and also failed to achieve the 95,000 subscriber target that it needed to trigger an additional $10 million in financing

from the New York Life defendants. In the fall of 1989, Microband ran out of cash, and in November 1989 plaintiffs were notified that they were being terminated for "cause". The evidence introduced at the trial makes it clear that the attempt to discharge plaintiffs for "cause" was primarily a strategy adopted to enable defendants to avoid making expensive severance payments.

In the instant action, plaintiffs asserted 13 causes of action, plus a demand for punitive damages. The first two causes of action alleged breach of plaintiffs' employment contracts by Microband. The third through tenth causes claimed, in part, that the TA defendants tortiously interfered with the subject employment contracts, instigated the wrongful termination of plaintiffs by making maliciously false and defamatory statements against them, breached the stockholders' agreement and violated their fiduciary duties. The last three claims were asserted against the New York Life defendants. Both the TA defendants and the New York Life defendants thereafter unsuccessfully moved for dismissal. Only the claim for punitive damages was dismissed, and the matter eventually came to trial,at the conclusion of which the court determined that Microband had breached its contracts with plaintiffs by terminating them for cause and failing to pay them severance as required. This aspect of the court's decision is not challenged on appeal. Instead, plaintiffs appeal from the dismissal of the complaint as against the TA defendants. Specifically, the court found that while the business judgment rule does not provide a viable defense, there was merit to defendants' assertions of an economic justification for interfering with the contract and a qualified privilege for the defamatory statements. This Court generally agrees with these conclusions, but we find that defendants may also rely upon the business judgment rule under applicable law.

Notwithstanding that the TA defendants instigated the plaintiffs' discharge because Microband was effectively bankrupt and wanted to save money by withholding the contractually mandated severance payments, rather than out of any dissatisfaction with plaintiffs' competency as managers of the company, the court properly concluded that defendants could not be held liable for tortious interference with contract.

In *Felsen v Sol Cafe Mfg. Corp.* (24 NY2d 682), a case not dissimilar to this one, the plaintiff was employed as defendant Sol Cafe's treasurer, comptroller and general administrator pursuant to a written contract, which provided for a specified weekly salary with increases at certain times during its

duration, as well as additional benefits and severance pay if not renewed. After defendant Chock Full O'Nuts purchased Sol Cafe's outstanding stock, one of the buyer's vice-presidents informed Felsen that his contract was being terminated. Felsen sued both Sol Cafe and Chock Full O'Nuts, asserting breach of contract against the former and malicious inducement of that breach by the latter. Although a jury found in favor of the plaintiff against both defendants, the Court of Appeals, despite affirming the judgment insofar as it related to Sol Cafe, held that the claim against Chock Full O'Nuts should have been dismissed since, as the sole stockholder of Sol Cafe, it had a sufficient economic interest to protect which would justify its interference with the contract between plaintiff and Sol Cafe unless the means chosen to safeguard that interest were illegal or motivated by malice toward the plaintiff *(supra,* at 687; *see also, Murtha v Yonkers Child Care Assn.,* 45 NY2d 913, 914-915). In *Koret, Inc. v Christian Dior* (161 AD2d 156, *lv denied* 76 NY2d 714), this Court stated that a corporate parent has the right to interfere with the contract of its subsidiary in order to promote its economic interests.

The trial court deemed the conduct of the TA defendants not to have been in good faith, and plaintiffs insist that this renders the defense of economic justification unavailable to them. However, the court did not find that defendants acted with malice, i.e., with the intent to harm plaintiff *(Ultramar Energy v Chase Manhattan Bank,* 179 AD2d 592, 593). Indeed, there is no indication of any personal animus against plaintiffs, their termination having been instigated strictly for the purpose of saving Microband money, and the motives of defendants were not markedly different than those of Chock Full O'Nuts in *Felsen v Sol Cafe Mfg. Corp. (supra).* Moreover, since Microband is a Delaware corporation, the Delaware business judgment rule applies *(see, Diamond v Oreamuno,* 24 NY2d 494, 503-504), under which it is presumed that a director's business decision was made in good faith, on an informed basis and in the honest belief that a particular action was in the best interests of the company *(Aronson v Lewis,* 473 A2d 805 [Del]).

Finally, plaintiffs object to the trial court's conclusion that while the charges lodged against the two executives were defamatory per se, the TA defendants possessed a qualified privilege to make them. As the Court of Appeals observed in *Liberman v Gelstein* (80 NY2d 429, 437), "[c]ourts have long recognized that the public interest is served by shielding certain communications, though possibly defamatory, from

litigation, rather than risk stifling them altogether [citation omitted]. When compelling public policy requires that the speaker be immune from suit, the law affords an absolute privilege, while statements fostering a lesser public interest are only conditionally privileged".

The conditional or qualified privilege, which applies to a " 'communication made by one person to another upon a subject in which both have an interest' " (supra, at 437), extends to, among others, employees of the same organization. "The rationale for applying the privilege in these circumstances is that so long as the privilege is not abused, the flow of information between persons sharing a common interest should not be impeded", yet "[t]he shield provided by a qualified privilege may be dissolved if plaintiff can demonstrate that defendant spoke with 'malice' ", which under common law meant spite or ill will (supra, at 437). As heretofore noted, there is no evidence of malice on the part of defendants. Concur—Sullivan, J. P., Rosenberger, Wallach, Kupferman and Nardelli, JJ.