■ WHITECAP (US) FUND I, LP, et al., Appellants, v SIEMENS FIRST CAPITAL COMMERCIAL FINANCE LLC et al., Respondents, and ALARM FUNDING LLC et al., Nominal Defendants-Respondents. [995 NYS2d 39]—

Order, Supreme Court, New York County (O. Peter Sherwood, J.), entered February 27, 2013, which granted defendants James Fleet, Peter Giacalone and Daniel Dooley's (the defendant directors) motion to dismiss the second cause of action as against them, and defendant Siemens First Capital Commercial Finance LLC's motion to dismiss the first, third, fourth, fifth, sixth, and seventh causes of action as against it, unanimously affirmed, without costs. Appeal from order, same court and Justice, entered February 25, 2013, unanimously dismissed, without costs, as academic.

Plaintiffs Whitecap (US) Fund I, LP, Whitecap (Offshore Fund) Fund I, Ltd. and Whitecap (Offshore) Fund II, Ltd. (collectively, Whitecap) are in the business of providing project funding to small businesses and entrepreneurs. In 2005, Whitecap launched a business venture with nonparty Security Associates International, Inc. (SAI), an entity in the business of monitoring residential security alarm systems. In that venture, Whitecap agreed to buy large blocks of alarm service contracts and SAI agreed that it would service those contracts in exchange for fees. Whitecap created nominal defendant Alarm Funding LLC (Alarm Funding) for the purpose of buying and owning the

service contracts for the joint venture.[1] From 2005 until 2007, Whitecap extended around $78 million in loans to Alarm Funding; Alarm Funding used the loans to buy alarm service contracts. Whitecap then sought an outside lender to help finance the purchase of more service contracts, and eventually chose First Capital Commercial Finance (First Capital). On May 25, 2007, the Alarm Funding Companies and First Capital, as an agent for other lenders, entered into an agreement providing the Alarm Funding Companies with a $40 million revolving credit line—later raised to $100 million—for the primary purpose of acquiring new alarm service contracts (the credit agreement).

The credit agreement contained a list of "events of default," the occurrence of which would entitle First Capital to exercise certain contractual remedies set forth in the credit agreement and in the related pledge agreements. In the pledge agreements, Whitecap agreed that its ownership interests in the Alarm Funding Companies would serve as pledged collateral for the loan.[2] Accordingly, through the pledge agreements, First Capital obtained the right to foreclose on the Alarm Funding Companies' ownership interest or to exercise all of the Alarm Funding Companies' accompanying voting rights after and during an event of default.

The credit agreement further reserved First Capital's enforcement rights under the agreement and the related credit documents, regardless of delay, and provided that failure to exercise any right did not constitute a waiver of that right: "No course of dealing and *no delay or failure of Agent or any Lender in exercising any right, power, remedy or privilege under any Credit Document shall affect any other or future exercise thereof or operate as a waiver thereof,* nor shall any single or partial exercise thereof or any abandonment or discontinuance of steps to enforce such a right, power, remedy or privilege preclude any further exercise thereof or of any other right, power, remedy or privilege" (emphasis added).

The credit agreement's terms also prohibited modification except in writing: "Any waiver, permit, consent or approval of any kind or character on the part of any Lender of any breach or default under this Agreement or any such waiver of any provision or condition of this Agreement must be in writing and

---

**1.** Unless otherwise noted, we refer to the borrowers Alarm Funding, CastleRock Security, Inc., and CastleRock Security Holdings, Inc. collectively as the "Alarm Funding Companies."

**2.** Nonparty Full Circle Partners LP also had an ownership interest in Alarm Funding, although Full Circle is not a party to this action.

shall be effective *only to the extent specifically set forth in such writing*" (emphasis added).

Defendant Siemens First Capital Commercial Finance LLC (Siemens) funded most of the credit line, and eventually became First Capital's successor-in-interest under the credit agreement.

The Alarm Funding Companies drew down on the line of credit to repay $30 million of debt to Whitecap, and for general corporate and working capital purposes. However, customers whose alarm contracts SAI was servicing began terminating their contracts or defaulting at an increased rate; these terminations and defaults, in turn, triggered an "event of default" under the credit agreement.

The Alarm Funding Companies offered Siemens certain concessions in return for a waiver of default, including allocating 100% of their net revenue to repayment of the loan balance under the credit agreement. Nonetheless, despite forbearance agreements with Siemens in November 2007, January 2008 and February 2008, the Alarm Funding Companies could not cure the customer attrition rate. As a result, Siemens suspended further advances under the line of credit.

In or around November 2008, Alarm Funding formed nominal defendant CastleRock Security, Inc. (CastleRock Security) to acquire SAI's assets and take over its operations. Over the course of two years, the Alarm Funding Companies repaid around $47 million to Siemens. Nonetheless, from November 2007 to September 2010, the Alarm Funding Companies were in violation of the credit agreement's leverage ratio and the attrition covenants, as well as other nonfinancial covenants in the credit agreement. Siemens waived the defaults and the parties restructured the loans over the course of several amendments to the credit agreement.

All told, the Alarm Funding Companies sustained net losses of $13.9 million in 2008, $26.1 million in 2009, and $22.5 million in the first nine months of 2010. As a result, Whitecap alleges, the Alarm Funding Companies needed to buy a large block of new contracts to replace the many it had lost.

Thus, in early- to mid-2010, Whitecap approached Siemens with a proposal to have the Alarm Funding Companies raise up to $20 million in additional capital so that business might improve. Siemens agreed in October 2010 that Whitecap could seek to raise additional capital for the Alarm Funding Companies through one or more public or private offerings. The parties memorialized this agreement in a signed writing, the third amendment to the credit agreement. The third amendment created nominal defendant CastleRock Security Holdings, Inc.

(CSH) to conduct an "Equity Raise"—that is, an IPO—of stock in a new combined entity comprising Alarm Funding and CastleRock Security.[3]

One condition of the third amendment, set forth in a new section, was that "contemporaneously with the closing of the Equity Raise," the Alarm Funding Companies would deposit the proceeds into two Siemens accounts, comprising the "Restricted Proceeds" and the "Remaining Proceeds." The third amendment also provided that if the IPO did not take place by March 1, 2011, CSH would immediately take all actions necessary to convert into a single-purpose entity (SPE) on March 2, 2011 in order to facilitate a sale of its assets. Further, the third amendment provided, "[n]o later than two weeks following the Third Amendment Effective Date [October 20, 2010], [the Alarm Funding Companies] shall deliver to [Siemens's] either (x) executed commitment letters with respect to a private Equity Raise (including from Whitecap or any of its Affiliates) or (y) evidence of the filing of an S-1 [with the Securities and Exchange Commission (SEC)] with respect to a public Equity Raise."[4]

On November 2, 2010, soon before the deadline for Whitecap and the Alarm Funding Companies to deliver evidence of an S-1 registration filing with the SEC or executed commitment letters, the Alarm Funding Companies and Siemens entered into a fourth amendment to the credit agreement. The fourth amendment created a new event of default provision in the credit agreement; that new provision would become effective if Whitecap did not deliver the S-1 by November 5, 2010. The fourth amendment did not, however, amend the March 2011 deadlines for depositing proceeds from the IPO or converting to an SPE.

By November 2010, the Alarm Funding Companies had filed an initial S-1 registration statement with the SEC, and by the end of 2010, they were awaiting a response from the SEC on six outstanding issues with the registration statement. According to the allegations in the complaint, Whitecap spent several million dollars working with lawyers, investment bankers and underwriters to advance the IPO in reliance on Siemens's "express contractual consent," and by the end of 2010, independent appraisers valued the Alarm Funding Companies at $47.6 million. Further, according to the complaint, the delay was at-

---

**3.** Alarm Funding agreed to transfer all its assets, including its ownership interest in CastleRock Security, Inc., to CSH, in exchange for shares of CSH.

**4.** A Form S-1 registration statement is the form that companies must file when issuing new securities.

tributable, in part, to Siemens's delay in providing comments that the Alarm Funding Companies had requested regarding financial statements. Whitecap alleged that it notified Siemens in December 2010 or early January 2011 that the IPO would be delayed until mid-April; Whitecap maintains that Siemens never objected or insisted that the IPO be completed by March 1.

On January 18, 2011, the Alarm Funding Companies and Siemens executed a fifth amendment to the credit agreement. The fifth amendment specifically retained the March 2011 deadlines for depositing proceeds from the IPO or converting to an SPE.

In mid-February 2011, Whitecap sent Siemens a draft sixth amendment to the credit agreement, reflecting the mid-April time line for completing the IPO. According to the complaint, Siemens agreed to respond to the draft sixth amendment without suggesting that the schedule was problematic.

On March 8, 2011 Siemens wrote to the Alarm Funding Companies, stating, among other things, that Siemens was reserving all its rights and remedies but that, upon certain conditions, it would agree to extend the date for the deposit of IPO proceeds until April 15 and would also extend the date for conversion to an SPE. Among the conditions were that Whitecap would fund the Alarm Funding Companies with $800,000, the credit documents would be amended to include a confession of judgment, a new officer and independent director from lists provided by Siemens would be appointed to the Alarm Funding Companies, and irrevocable stock proxies would be delivered to the new officer to be effective upon either failure of the IPO and deposit of its proceeds by April 15, 2011 or another event of default. In the letter, Siemens stated that time was of the essence.

By email the next day, March 9, 2011, Whitecap rejected Siemens's conditions, stating that many of them would render it impossible for the Alarm Funding Companies to raise the equity they sought. Attached to the email were, among other things, a "draft sixth amendment to the loan agreement," which Whitecap stated "reflect[ed] the terms and conditions [it was] prepared to accept" and a memorandum projecting increased attrition above previous forecasts. The email did not contest that Whitecap was in default.

On March 15, 2011, six days after Whitecap rejected Siemens's conditions, Siemens removed the Alarm Funding Companies' officers and directors and replaced them with the defendant directors in keeping with its rights under the pledge agreement to take voting control of the Alarm Funding Companies. According

to the complaint, Siemens offered the next day to rescind its actions and allow the Alarm Funding Companies to pursue an IPO if Whitecap made an immediate payment of $12 to $14 million, but Whitecap refused that offer. Further, according to the complaint, on the same day, one of the defendant directors informed Alarm Funding's auditor that the new management was cancelling the IPO.

Whitecap commenced this action directly and derivatively on behalf of the Alarm Funding Companies. In the first five counts of the seven-count complaint, Whitecap interposed derivative claims on the Alarm Funding Companies' behalf. Specifically, in the first and second causes of action, Whitecap asserted causes of action for breach of fiduciary duty derivatively against both Siemens and the director defendants, respectively. In the third and fourth causes of action, Whitecap interposed derivative claims against Siemens for breach of the credit agreement and breach of the pledge agreements, and, in the fifth cause of action, Whitecap interposed derivative claims against Siemens for breach of the implied duty of good faith and fair dealing.

In the sixth cause of action, Whitecap interposed a claim directly against Siemens for breach of the pledge agreements, and in the seventh cause of action, Whitecap interposed a claim directly against Siemens for breach of the implied duty of good faith and fair dealing.

The defendant directors and Siemens moved under CPLR 3211 (a) (1) and (7) to dismiss the complaint as against them. We now affirm the dismissal of the complaint against both the director defendants and Siemens.

The motion court properly dismissed the five derivative claims, because Whitecap failed adequately to allege demand futility. Demand futility in this case is governed by the laws of Delaware, where the Alarm Funding Companies are incorporated (*Hart v General Motors Corp.*, 129 AD2d 179, 182 [1st Dept 1987], *lv denied* 70 NY2d 608 [1987]). Under Delaware law, where, as here, no demand has been made on corporate directors to bring a lawsuit, a derivative action may be brought on the corporation's behalf only where the complaint alleged particularized facts that such a demand would have been futile (*Aronson v Lewis*, 473 A2d 805, 807-808 [Del Sup Ct 1984], *overruled on other grounds by Brehm v Eisner*, 746 A2d 244 [Del Sup Ct 2000]). To allege demand futility, the complaint must set forth particularized facts sufficient to raise a reasonable doubt that either (1) the directors are disinterested and independent, or (2) the challenged transaction was the result of a protected business judgment (473 A2d at 814).

In the first *Aronson* prong, a director is interested if she appears involved on both sides of a transaction or expects to receive a personal financial benefit from self-dealing beyond the benefit accruing to the corporation and its other stockholders (*Orman v Cullman*, 794 A2d 5, 23 [Del Ch Ct 2002]). A director is not independent if influenced by extraneous considerations such as control by another (*id.* at 24).

Here, Whitecap alleges no facts in the complaint from which it can be inferred that a demand on the corporations' board of directors to bring the action would have been futile. Because the complaint alleges no facts that the directors of the Alarm Funding Companies appeared involved on both sides of the decision to abandon the IPO, or that they expected material benefits from self-dealing, the complaint fails to allege that they were interested. Moreover, the complaint makes no allegation that the director defendants were not independent, other than that Siemens appointed them. This allegation is insufficient to raise a reasonable doubt as to independence; on the contrary, appointment at the behest of those controlling the outcome of a corporate election "is the usual way a person becomes a corporate director" (*Aronson*, 473 A2d at 816). Thus, the complaint fails to allege facts sufficient to meet the first *Aronson* prong for demand futility.

Similarly, Whitecap failed to allege facts sufficient to raise a doubt that the defendant directors' decision to abandon the IPO was taken honestly and in good faith or that the director defendants were adequately informed in making their decision, as necessary to satisfy the second *Aronson* prong (*In re J.P. Morgan Chase & Co. Shareholder Litig.*, 906 A2d 808, 824 [Del Ch Ct 2005], *affd* 906 A2d 766 [Del Sup Ct 2006]). The complaint simply alleges in a conclusory manner that the decision to abandon the IPO was not a valid business judgment because it was made within a day after the defendant directors assumed their posts, and without obtaining information from the Alarm Funding Companies' lawyers, underwriters and former management who had been working on the planned IPO. However, other than the allegation that the defendant directors had "little or no knowledge of the IPO or the Alarm Funding Companies' operations," the complaint makes no allegations regarding what specific knowledge the director defendants did or did not possess when making the decision (*id.*).

Moreover, Whitecap offered the motion court no explanation as to how canceling the IPO constituted an invalid business decision, other than to assert that because the IPO was essential to the Alarm Funding Companies' ability to continue as a going

concern, the decision to cancel it was "irrational on its face." This argument, however, begs the question, for the substance of the decision cannot be used as evidence of its impropriety without second guessing the directors' actions—the very act that the business judgment rule forecloses (*In re Walt Disney Co. Derivative Litig.*, 907 A2d 693, 749-750 [Del Ch Ct 2005], *affd* 906 A2d 27 [Del Sup Ct 2006]).

The sixth cause of action alleges breach of contract directly against Siemens. Whitecap asserts in the complaint that the closing dates were not of the essence, and therefore, that the failure to strictly comply with them did not trigger an event of default. We disagree. In an action at law for breach of contract damages, when the parties have specified a time for performance, there is a presumption that the parties agreed that time is of the essence unless they have used contrary language in the agreement (*Cooper-Rutter Assoc. v Anchor Natl. Life Ins. Co.*, 193 AD2d 944, 945 [3d Dept 1993]).

Here, a reading of the record reveals that when the parties wished to change certain interim dates, they did so by amending the relevant dates in the amendments to the credit agreement. Despite those various changes, however, there was one date the parties never changed: the March 1, 2011 deadline for depositing the proceeds of the IPO. Indeed, the third amendment stated that if the Alarm Funding Companies did not deposit the restricted proceeds and the remaining proceeds by March 1, 2011, their failure to do so would constitute an event of default. The third amendment also stated that if the IPO were not completed by March 2, 2011, Whitecap was obliged to convert CSH into an SPE. Likewise, the fifth amendment explicitly stated that the Alarm Funding Companies would be in default for failing to deposit proceeds from an IPO by March 1. By agreeing to this language in both the third and the fifth amendments, the parties effectively agreed that time was of the essence (*see Parker Hannifin Corp. v North Sound Properties*, 2013 WL 1932109, \*6, 2013 US Dist LEXIS 67026, \*16-19 [SD NY, May 8, 2013, No. 10 CV 6359 (MHD)]; *Cooper-Rutter Assoc.*, 193 AD2d at 945; *cf. Lusker v Tannen*, 90 AD2d 118, 124 [1st Dept 1982] [general rule is that in an executory contract, time is of the essence unless the parties state a contrary intent, although in real estate contracts, courts follow the converse rule that time is *not* of the essence unless the parties state a contrary intent]).

In fact, Whitecap acknowledged by its conduct that it had breached the credit agreement's terms when it sent Siemens the draft of the sixth amendment to the credit agreement,

proposing a May 15 deadline. Siemens responded on March 8, setting forth the terms under which it would be willing to extend the deadline. Whitecap rejected those terms and proposed terms of its own; Siemens decided that those terms were not acceptable. Only then did Siemens exercise its rights under the credit agreement. Thus, the breach was never actually in dispute. As a result, because the Alarm Funding Companies failed to comply with the language in the third and fifth amendments, Siemens did not breach the credit agreement or pledge agreements by exercising its rights under those agreements to vote Whitecap's shares and replace the directors.

Contrary to Whitecap's arguments, Siemens neither waived the March 1 deadline nor was estopped from enforcing it. To begin, in arguing that Siemens contributed to the delay in the IPO, Whitecap makes only conclusory allegations that the IPO would have gone forward before mid-April had Siemens only cooperated with Alarm Funding's request for comments. The only non conclusory allegations in the complaint refer to negotiations occurring before the third amendment, when the parties established the March 1 deadline; of course, those negotiations could not have contributed to the Alarm Funding Companies' inability to honor the deadline after it had been set.

Similarly, there is no merit to Whitecap's arguments that Siemens acquiesced in delaying the IPO, knowingly permitted the Alarm Funding Companies to continue to work on closing the IPO, and affirmatively continued to negotiate after the closing date. In fact, the record partly contradicts these allegations: on January 18, 2011, the Alarm Funding Companies, Whitecap and Siemens entered into a fifth amendment to the credit agreement, and, as noted above, that amendment specifically retained March 1 as the deadline for the Alarm Funding Companies to deposit proceeds from an IPO.

Whitecap alleges, however, that Siemens agreed to comment on the draft proposed sixth amendment in mid-February 2011, and that Siemens's actions constituted a waiver. While courts may find a waiver where one party encourages another to continue to perform for the first party's benefit (*see e.g. Burgess Steel Prods. Corp. v Modern Telecom.*, 205 AD2d 344, 346 [1st Dept 1994]), this case presents a different situation: the Alarm Funding Companies pursued the IPO for its own and Whitecap's benefit, not Siemens's. Indeed, as we have already noted, Whitecap itself states that the IPO was essential to the Alarm Funding Companies' ability to continue as a going concern.

At any rate, even assuming for the sake of argument that Siemens's actions could constitute a waiver, the credit agree-

ment contained a no-waiver clause. Unfruitful negotiations to restructure or extend the terms of the third amendment to the credit agreement did not limit Siemens's rights under the third amendment, as the no-waiver clause protected those rights (*see Bercy Invs. v Sun*, 239 AD2d 161, 162 [1st Dept 1997]). We decline to find otherwise, as a contrary holding could have a chilling effect on parties' willingness to renegotiate mutually acceptable terms rather than simply foreclose on collateral or resort to costly litigation.

The seventh cause of action, alleging breach of the implied duty of good faith and fair dealing directly against Siemens, duplicates the sixth cause of action (*see Netologic, Inc. v Goldman Sachs Group, Inc.*, 110 AD3d 433, 433-434 [1st Dept 2013]). Thus, the motion court properly dismissed this cause of action.

We have considered Whitecap's remaining contentions and find that they are without merit. Concur—Tom, J.P., Acosta, Moskowitz, Gische and Clark, JJ.