**John C. BOLAND, Plaintiff–Appellant,**

v.

**Clyde Wm. ENGLE, Phillip J. Robinson, Harold Sampson, Gerald M. Tierney, Richard H. Kendall, Everett A. Sisson, J. Frank Surface, Forest D. Richardson, Jr., Wisconsin Real Estate Investment Trust, Hickory Furniture Company, Defendants–Appellees,**

**and**

**Indiana Financial Investors, Inc., Nominal Defendant–Appellee.**

No. 96–1929.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 29, 1996.

Decided May 12, 1997.

Laurence D. Paskowitz, Roy L. Jacobs, Michael P. Fuchs (argued), Wolf, Popper, New York City, Richard N. Bell, Cohen & Malad, Indianapolis, IN, for Plaintiff–Appellant.

William D. Heinz (argued), Patricia A. Bronte, Norman M. Hirsch, Jenner & Block, Chicago, IL, Harry L. Gonso, Ice, Miller, Donadio & Ryan, Indianapolis, IN, for Defendants–Appellees Clyde W. Engle, Harold Sampson, Everett A. Sisson.

Gerald M. Tierney, Chicago, IL, for Defendant–Appellee Wisconsin Real Estate Investment Trust.

Craig D. Doyle, Leeuw, Plopper & Beeman, Indianapolis, IN, for Defendant–Appellee Indiana Financial Investors, Inc.

Before WOOD, Jr., KANNE, and ROVNER, Circuit Judges.

KANNE, Circuit Judge.

John Boland is a shareholder of Indiana Financial Investors, Inc. (Indiana Financial). Boland brought suit alleging that its president and chairman of the board, Clyde Engle, has masterminded a complicated scheme to "upstream" the assets of Indiana Financial to other corporations controlled by Engle. Boland's complaint set forth seven claims: two derivative counts (*i.e.*, on behalf of

Indiana Financial) alleging that Indiana Financial's directors and its parent company had breached their common-law fiduciary duties; two derivative counts for breach of contract against the companies to which Engle has allegedly spirited away Indiana Financial's assets; and three direct counts (*i.e.*, on behalf of Boland himself) against Indiana Financial's directors and its parent company alleging violations of the Investment Company Act (ICA) of 1940, 15 U.S.C. sec.sec. 80a–1 to –64.

The individual defendants moved for dismissal for failure to state a claim, and the District Court dismissed the five counts against them. The District Court held 1) that the common-law fiduciary duty counts required Boland first to demand action from Indiana Financial's board of directors, and 2) that the ICA counts should have been pleaded derivatively. Boland then requested the District Court to dismiss all remaining counts so he would have a final judgment from which to appeal. Because we find the District Court's persuasive reasoning to have resolved the issues, we affirm the judgment. We also hold that when Boland requested dismissal he forfeited any opportunity after this appeal to go back and make demand on the Indiana Financial board.

## I. History [1]

Clyde Engle operates a corporate pyramid of interconnected public and private companies. Indiana Financial is an Indiana corporation that has traditionally managed a diversified portfolio of real estate investments. Although Indiana Financial is a public corporation and had 617 shareholders in November 1993, the company lies at the bottom of

Engle's pyramid. Boland alleges that Engle has shifted assets from Indiana Financial up the corporate pyramid, first to Indiana Financial's corporate parent, Hickory Furniture Company (Hickory), and ultimately to Engle himself through two more intermediate corporations. In the place of these assets, Engle has left behind, according to Boland, only promissory notes which Engle's companies never repay to Indiana Financial. Boland alleges that Indiana Financial's net worth has fallen from over $11 million in 1989 to only $205,000 in 1993.

As to the details of this alleged scheme, Engle has an effective ownership interest in Indiana Financial of approximately 32 percent.[2] Engle has been a director of Indiana Financial since 1980, its chairman since 1986, and its president since 1992. Defendant Harold Sampson has also been a director since 1986, but defendants Everett A. Sisson and J. Frank Surface were directors only between 1986 and 1992. All four of these defendants have also held director or officer positions in other companies in Engle's corporate pyramid.[3]

After writing a *Fortune* magazine article in 1984 stating that Engle was misusing his control of Indiana Financial and Hickory, Boland became an Indiana Financial shareholder in 1988. His 1993 complaint challenges the propriety of Indiana Financial's actions regarding four transactions with Hickory. The first occurred in 1987, when Indiana Financial conveyed real estate to Hickory in exchange for two promissory notes due in 1992. Hickory defaulted on the notes in 1992 and continues to be in default to this day. The second transaction occurred

---

1. We review *de novo* a district court's dismissal for failure to state a claim. *Porter v. DiBlasio*, 93 F.3d 301, 305 (7th Cir.1996). And like a district court, we must accept as true all well-pleaded factual allegations and the inferences reasonably drawn therefrom. *Id.*

2. Engle owns more than 50 percent of the stock of RDIS, Inc., which owns 100 percent of the common stock of Telco Capital Corp., which owns 93 percent of the common stock of Hickory, which owns approximately 69 percent of the common stock of Indiana Financial. Simple arithmetic implies a minimum ownership interest of approximately 32 percent.

3. Boland voluntarily dismissed defendants Phillip Robinson, Gerald Tierney, and Forest Richardson, Jr. in the proceedings below. The District Court also ordered Boland to show cause why defendant Richard Kendall should not be dismissed. Boland never responded to the District Court order and does not challenge the order on appeal. By our count, therefore, only Engle, Sampson, Sisson, and Surface (along with Hickory and Wisconsin Real Estate Investment Trust) remain as defendants.

in 1988 when Indiana Financial conveyed its Indianapolis Hilton Hotel property to Hickory in exchange for a promissory note due in 1989. Hickory failed to repay that note in 1989, and Indiana Financial agreed in 1990 to extend the maturity date to 1992, but Hickory again defaulted. The third transaction involved Indiana Financial paying cash to Hickory in exchange for an interest in a promissory note that another Hickory subsidiary had issued to Hickory. The other subsidiary, Wisconsin Real Estate Investment Trust (WREIT), never paid Indiana Financial when the note came due in 1992. The fourth transaction occurred in 1992 and 1993 when Indiana Financial advanced $668,500 to Hickory on an unsecured basis. Boland alleges that no rational business would have lent money without security to a company in Hickory's financial straits. Indiana Financial, moreover, has not tried to collect on any of these obligations or to enforce whatever security interests it retains.

Boland alleged seven causes of action in his complaint. Boland alleged two common-law causes of action against Indiana Financial directors and against Indiana Financial's parent company, Hickory. These claims alleged that the defendants breached their fiduciary duties to Indiana Financial when they caused Indiana Financial to enter into the last three transactions listed above. Boland pleaded these counts derivatively, but he asserted that the normal demand requirement was excused because 1) a majority of Indiana Financial board members in 1993 were directors and/or officers of Hickory and WREIT, 2) a majority of the board has benefitted financially from the challenged transactions, and 3) the board's actions would not have been the result of reasonable business judgment. The District Court dismissed these two causes of action with respect to the individual defendants, holding that Boland had not supplied adequate reasons for failing to make demand.

Boland also brought two derivative breach of contract causes of action against Hickory and WREIT, respectively. These claims alleged that Hickory and WREIT were in breach on their unpaid notes owed to Indiana Financial. The District Court did not initially consider these claims because Hickory and WREIT never sought their dismissal.

Finally, Boland brought three ICA claims directly, in his own right, against Indiana Financial directors and Hickory. Boland alleged that Indiana Financial qualified as an investment company because securities exceeded 40 percent of its assets and that Indiana Financial's transactions therefore became subject to the ICA. *See* 15 U.S.C. § 80a–3(a)(3). Boland further alleged that three of the Indiana Financial transactions violated ICA provisions that prohibit 1) investment companies from lending funds to or purchasing securities from an affiliate, 15 U.S.C. § 80a–17; 2) fiduciaries of an investment company from breaching their duties to the investment company, 15 U.S.C. § 80a–35(a); and 3) the conversion of assets of investment companies, 15 U.S.C. § 80a–36(a). The District Court, however, dismissed Boland's ICA claims against the individual defendants for failure to state a claim. The court held that Boland needed to plead the ICA counts derivatively rather than directly.

Rather than making demand upon Indiana Financial's board or repleading his ICA claims, Boland tried to appeal the District Court's ruling immediately. He voluntarily dismissed the appeal, however, when this court reminded Boland that he did not yet have a final decision, which 28 U.S.C. § 1291 requires for appellate jurisdiction. Boland did not yet have a final decision because the five dismissed counts were dismissed only as to the individual defendants (not with respect to Hickory) and because the District Court had never even considered Boland's breach of contract actions against Hickory and WREIT. Rather than trying to comply with the District Court's ruling, however, Boland asked the District Court to dismiss all remaining counts in order to finalize the judgment for appeal. The District Court granted Boland's motion and dismissed the entire case with prejudice on March 19, 1996.

## II. Analysis

### A. Common-Law Breach of Fiduciary Duty Claims

■ Boland argues on appeal that the District Court should not have dismissed his

common-law derivative claims alleging breach of fiduciary duty. As mentioned above, the District Court held that Boland never adequately explained his failure to demand action from Indiana Financial's board prior to bringing suit. And because Boland never made demand, the District Court refused to let Boland's derivative claims go forward.

What Boland should have done regarding demand is governed by both federal procedural requirements and state substantive law. The Federal Rules of Civil Procedure provide that when a shareholder brings a derivative action to enforce a right that the corporation has failed to enforce, the complaint shall "*allege with particularity* the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors ... and the reasons for the plaintiff's failure to obtain the action or for not making the effort." Fed.R.Civ.P. 23.1 (emphasis added). Notice, however, that the rule neither requires a plaintiff to make demand nor governs what excuses are acceptable for failing to make demand. Those issues, of course, are governed by state substantive law. *See Kamen v. Kemper Fin. Servs., Inc.,* 500 U.S. 90, 96–97, 111 S.Ct. 1711, 1716–17, 114 L.Ed.2d 152 (1991); *Starrels v. First Nat'l Bank of Chicago,* 870 F.2d 1168, 1170 & n. 4 (7th Cir.1989). Rule 23.1 does require plaintiffs, however, to give federal courts enough information in the pleadings for the courts to apply the state law. The procedural and substantive concerns thus dovetail to a large degree because a federal court cannot decide whether a plaintiff's reasons for not making demand satisfy state law unless the plaintiff's pleadings tell the court what those reasons are.

Boland's complaint contains three rather conclusory paragraphs that state his reasons for not making demand. Standing alone, those paragraphs would certainly not suffice to excuse demand. Boland argues, however, that those paragraphs must be read in light of his entire complaint of allegations. The better practice surely would have been to develop the reasons themselves with more particularity. *See generally* 7C Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, *Federal Practice and Procedure* § 1831 (2d ed. 1986) ("[I]t is a good practice to provide as detailed an explanation in the complaint concerning the lack of a demand as is possible."). Yet even when we read Boland's complaint as a whole, we do not think he has shown that Indiana's substantive law would excuse his failure to make demand.

In a case where state law provides the rule of decision, our job in the federal courts is to predict how the highest court of the state would decide the case if presented with the case today. *See McGeshick v. Choucair,* 72 F.3d 62, 65 (7th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1834, 134 L.Ed.2d 937 (1996); *Konradi v. United States,* 919 F.2d 1207, 1213 (7th Cir.1990). Indiana clearly encourages shareholders to make demand before bringing derivative lawsuits. By statute, a complaint brought in Indiana state court "in the right of a corporation" must "allege with particularity the demand made" or "why the shareholder did not make the demand." Ind.Code § 23–1–32–2. A state that did not care whether shareholders make demand would not need such a pleading requirement.

Indiana case law, however, does little to elaborate on what circumstances excuse demand. The most recent precedent we can find is from the state intermediate appellate court and is over 20 years old. That case, *Cole Real Estate Corp. v. Peoples Bank and Trust Co.,* 160 Ind.App. 88, 310 N.E.2d 275 (1974), holds that a minority shareholder does not have to exhaust intracorporate remedies (such as making demand) where "the directors of that corporation are acting in their own interests" because "[e]quity does not require the doing of a useless act." Id. 310 N.E.2d at 278–79; *see also First Merchants Nat'l Bank & Trust Co. of Lafayette v. Murdock Realty Co.,* 111 Ind.App. 226, 39 N.E.2d 507, 512–13 (1942); *Marcovich v. O'Brien,* 63 Ind.App. 101, 114 N.E. 100, 103 (1916); *Tevis v. Hammersmith,* 31 Ind.App. 281, 66 N.E. 79, 80 , *aff'd,* 161 Ind. 74, 67 N.E. 672, 672–73 (1903). The most recent Indiana Supreme Court precedent is over a

century old [4] and similarly holds that it would be a "farce" to "require those who are charged with a conversion of the assets to bring suit in the name of the corporation against themselves, and to furnish the proof to sustain the charge." *Wayne Pike Co. v. Hammons*, 129 Ind. 368, 27 N.E. 487, 489–90 (1891).

These precedents unfortunately do not directly decide the case before us. *Cole Real Estate*, for example, says demand is excused when "the directors" are acting in their own interests, but the case does not spell out how many directors must be involved to excuse demand. Indiana Financial had only two directors when Boland brought this lawsuit: Engle and Sampson. Boland makes a plausible argument that Engle, by helping Hickory at the expense of Indiana Financial, was indirectly siphoning assets up the corporate pyramid for his own benefit. One cannot say the same, however, about Sampson who does not appear to have any financial stake in Hickory.[5] If one out of two directors allegedly acted in his own interest, does that excuse demand? *Cole Real Estate* provides no answer. In *Wayne Pike*, a majority of the directors were accused of converting company assets, and the Indiana Supreme Court excused demand. The court did not state, however, whether demand would be excused when a board is not dominated by alleged wrongdoers. *Cf. Harris Bank Libertyville v. Romtech America Corp.*, No. 92 C 5456, 1992 WL 396775, at *5 (N.D.Ill.Dec.23, 1992) (noting that "two of four directors is not a majority" that would excuse demand under Illinois law). Nevertheless, state precedents "must be scrutinized with an eye toward the broad policies that informed those adjudications." *Town of East Troy v. Soo Line R.R.*, 653 F.2d 1123, 1129 (7th Cir.1980) (quoting *McKenna v. Ortho Pharm. Corp.*, 622 F.2d 657, 662 (3d Cir.1980)). Both *Wayne Pike* and *Cole Real Estate* suggest that the general reason behind excusing demand is that it would be silly to require shareholders to take useless actions. Uselessness, however, depends on context. Where one of a board's two directors does not appear to have personally benefitted and where, as discussed below, boards of directors in Indiana are now statutorily authorized to appoint disinterested committees to investigate shareholder complaints, it may well be useful to require a shareholder to take a complaint to the board before taking it to the courts.

In the absence of controlling precedent from a state's highest court, we may also "consider relevant authority of other jurisdic-

4. The absence of more recent Indiana Supreme Court precedent might be explained by the fact that until the state constitution was amended in 1988, that court was required to hear the appeals from all criminal judgments imposing sentences greater than 10 years. *See* Ind. Const. art. 7, § 4 (repealed 1988). Over 85 percent of the court's docket therefore consisted of criminal appeals. *See* George T. Patton, Jr., *Recent Developments in Indiana Appellate Procedure: Reforming the Procedural Path to the Indiana Supreme Court*, 25 Ind.L.Rev. 1105, 1105 (1992).

5. Sampson, of course, might not be disinterested when deciding whether Indiana Financial should sue Sampson himself. The fact that a shareholder has asked board members to sue themselves, however, cannot automatically excuse demand. Indiana's case law suggests that demand is excused when directors have personally profited at the company's expense, not when they have some outside interests regarding the litigation. As discussed below, where a board is disabled because directors are conflicted, Indiana's statutory law authorizes the board to appoint an independent, disinterested committee to investigate shareholder complaints. Furthermore, directors will often actually be disinterested regarding whether they should sue themselves because the business judgment rule or directors' and officers' liability insurance will protect them from personal liability. *Cf. Kamen v. Kemper Fin. Servs., Inc.*, 939 F.2d 458, 461 (7th Cir.1991); *Atkins v. Tony Lama Co.*, 624 F.Supp. 250, 256 (S.D.Ind.1985).

Boland, moreover, has not alleged with any particularity how Sampson acted in his own interest regarding any of the transactions with Hickory. Admittedly, Boland alleges that Sampson serves as a trustee of WREIT, and one of the challenged transactions involved Indiana Financial's purchase from Hickory of a note issued by WREIT. Indiana Financial's purchase of the note, however, did not alter WREIT's obligation under the note. Boland has therefore not shown how Sampson personally benefitted from the transaction. At most, Boland has shown that Sampson would face competing fiduciary duties when deciding whether Indiana Financial should bring the breach of contract action against WREIT. As stated above, outside interests regarding the litigation may disqualify a director from voting but that does not necessarily excuse demand.

tions that have addressed the issue." *Erie Ins. Group v. Sear Corp.*, 102 F.3d 889, 892 (7th Cir.1996); cf. *Kamen v. Kemper Fin. Servs., Inc.*, 939 F.2d 458, 460–62 (7th Cir. 1991). Indeed, Boland himself argues that Indiana would apply Delaware's test for demand futility, as announced in *Aronson v. Lewis*, 473 A.2d 805 (Del.1984). Although Delaware corporate law is undoubtedly persuasive authority, Boland's argument that the Indiana Supreme Court would follow Delaware just because the Indiana Court of Appeals cited *Aronson* for a different proposition in *Brane v. Roth*, 590 N.E.2d 587 (Ind. Ct.App.1992), is not convincing.

Rather, we surmise that the highest court in Indiana would today be persuaded by the general trend in the law towards narrowing, if not eliminating, the exceptions from the demand requirement. Eleven states have statutorily imposed a universal demand requirement. *See* Conn.Gen.Stat. § 33–722; Fla.Stat. ch. 607.07401(2); Ga.Code Ann. § 14–2–742; Mich.Comp.Laws § 450.1493a; Miss.Code Ann. § 79–4–7.42; Mont.Code Ann. § 35–1–543; Neb.Rev.Stat. § 212072; N.H.Rev.Stat.Ann. § 293–A:7.42; N.C.Gen. Stat. § 55–7–42; Va.Code Ann. § 13.1672.1; Wis.Stat. § 180.0742. And both the case law and the academic commentary have been moving strongly in that direction as well. *See, e.g., Kamen*, 939 F.2d at 461–63; *Cuker v. Mikalauskas*, —— Pa. ——, ——, 692 A.2d 1042 (1997); American Law Institute, *Principles of Corporate Governance: Analysis and Recommendations* § 7.03 (1994) (hereinafter *ALI Principles*); Model Bus.Corp.Act § 7.42 (1991).

All of these sources recognize that whether a corporation should pursue a right of action is a complicated business question on which courts need assistance. Legal expertise is relevant to such business decisions, but hardnosed business acumen will be a better judge of whether corporate norms have been violated and whether litigation would be worth the costs to the corporation. Litigation against corporate managers, for example, may benefit corporations in a number of ways, including both the recovery of damages and the deterrence of future misconduct. *See generally* Reinier Kraakman et al., *When Are Shareholder Suits in Shareholder Interests?*, 82 Geo.L.J. 1733, 1738–39 (1994). But even where litigation would be beneficial, "acts short of litigation could have net benefits exceeding those of litigation." *Starrels*, 870 F.2d at 1173 (Easterbrook, J., concurring). Requiring demand thus serves as a valuable screen of potential lawsuits, both by giving corporations a crack at resolving shareholder complaints before litigation and by giving courts more information on which to decide the merits of those suits that remain after demand.[6]

Admittedly, courts would learn little from a board's decision not to pursue litigation if the board itself had personal interests against litigation. Indiana law, however, anticipates this dilemma. A section of the Indiana Business Corporation Law (IBCL), passed in 1986, allows a board of directors to establish an independent committee of disinterested directors or other disinterested persons to determine "whether it is in the best interests of the corporation to pursue" a right or a remedy through a derivative proceeding. *See* Ind.Code § 32–1–32–4. This section makes the committee's decision presumptively "conclusive against any shareholder making a demand or bringing a derivative proceeding with respect to such right or remedy" unless the committee was not truly disinterested or did not make a good faith investigation. *Id.*

Boland argues that this IBCL provision does not govern demand futility but rather merely permits a board to respond to a demand or a lawsuit by setting up a commit-

---

6. To quote one commentator:
   Even in circumstances in which the board is arguably disqualified due to interest, the corporation still possesses a possibly beneficial range of options when faced with demand. After all, the interested board may appoint a disinterested subgroup of the board or create a special litigation committee to address the shareholder concerns. Thus, requiring presuit demand to a biased board is not necessarily futile and may in fact yield fruitful results. Carol B. Swanson, *Juggling Shareholder Rights and Strike Suits in Derivative Litigation: The ALI Drops the Ball*, 77 Minn.L.Rev. 1339, 1354 n. 92 (1993).

tee—something Indiana Financial's board has not done. Strictly speaking, Boland is correct. We cannot help but think, however, that the Indiana Supreme Court would be influenced by the availability of this procedure when deciding the scope of Indiana's demand futility exception. If even biased boards are statutorily authorized to appoint disinterested committees, fewer situations exist where it would be futile to expect the board to respond to shareholder concerns. Moreover, the IBCL provision endorses a general policy of letting businesspeople investigate and pass upon shareholder allegations before invoking cumbersome judicial processes. The provision's official commentary (which courts may consult "to determine the underlying reasons, purposes, and policies" of the IBCL, see Ind.Code § 23–1–17–5) tells us that "the decision whether and to what extent to investigate and prosecute corporate claims, like other questions of corporate policy and management, should in most instances be subject to the judgment and control of the board." Ind.Code § 23–1–32–4 Official Comments.

Indiana law presumably would retain some exceptions to the demand requirement because, as noted above, the IBCL directs shareholders to allege with particularity "why the shareholder did not make the demand." Such language, however, is compatible with even the ALI "universal demand" model which itself excuses demand if a corporation would face irreparable harm while its board considered a shareholder demand. See ALI Principles, supra, § 7.03(b). In-

deed, we suspect the Indiana Supreme Court might well follow the ALI proposal regarding demand. In a recent corporate-law case, the Indiana Supreme Court adopted wholesale another section of the *ALI Principles. See Barth v. Barth*, 659 N.E.2d 559, 562–63 (Ind. 1995) (adopting § 7.01(d) of the *ALI Principles* regarding whether a shareholder of a closely-held corporation may proceed by direct action). That decision implies to us that the *ALI Principles* have strong persuasive force in Indiana when fashioning corporate law.

We need not decide, however, whether Indiana's highest court would go all the way to a universal demand requirement in order to decide that it probably would have wanted Boland to make demand here. Although the corporate shenanigans that Boland has alleged appear quite egregious, we do not think it would have been futile to expect the Indiana Financial board to take some remedial action. Of the corporation's two directors at the time of the suit, only Engle was alleged to be benefitting personally from the transactions. Engle's benefit, moreover, was only indirect—the transactions had some arguable business merit and Engle benefitted only by way of the interconnections of the companies in his corporate pyramid. A direct pilfering of corporate assets, for example, might present a different case. In short, making demand here would have been a reasonable action, giving the Indiana Financial board a chance to remedy the allegations or appoint a disinterested committee to investigate them.[7] We therefore agree with the

---

7. Boland argues that the defendants waived their right to establish a disinterested committee once they moved to dismiss this action. Appellant's Reply Br. at 13 n. 9. Boland is wrong in viewing the right to appoint a committee as some kind of affirmative defense that individual defendants either invoke or forfeit. A shareholder derivative suit is a cause of action that a shareholder thinks the *corporation* should bring against some person or entity that has wronged it. The right to appoint a committee belongs to the board of directors of the corporation, and the defendants in a shareholder derivative suit may or may not be members of that board. In this case, for example, two defendants are members of Indiana Financial's board, but defendants Sisson and Surface are no longer members, and defendants WREIT and Hickory never were. These nonmembers therefore certainly could not have

waived the right to appoint a committee because they never had the ability to appoint one.

Moreover, Boland's waiver argument cannot be right because it would make demand the exception rather than the rule in shareholder derivative litigation. If boards of directors are faced with the choice of either moving to dismiss a shareholder lawsuit for failure to make demand or setting up a disinterested committee, few boards would move to dismiss for fear of losing the right to appoint a committee. Unless a board is extremely confident that demand will not be excused (and that the action will therefore be dismissed), the board would rarely risk its right to appoint a committee. Knowing that boards are unlikely to move for dismissal, few shareholders would bother to make demand. Boland's waiver argument would therefore gut the demand requirement, allowing shareholders

District Court that Boland should have made demand upon the Indiana Financial board.

■ Boland argues, however, that even if he should have made demand, the District Court should have stayed the action to give him an opportunity to do so rather than dismissing the action outright. What Boland fails to recognize, however, is that he was the one who asked the District Court to dismiss the entire action so that he could appeal. After the District Court initially dismissed the five counts against the individual defendants, Boland was free at that point to make demand on the Indiana Financial board. Boland could have simply asked the court to stay the litigation while he made demand. And because the initial dismissal was without prejudice, Boland could have amended his complaint after the board considered his demand. *See* Fed.R.Civ.P. 15(a).

Boland, however, was unhappy with the District Court's ruling and therefore appealed immediately. His first attempt to appeal was unsuccessful because he still had claims pending in the District Court. He therefore moved that the District Court dismiss the remaining counts to create an appealable final decision. The case law is clear, however, that when a district court grants voluntary dismissal under Federal Rule of Civil Procedure 41(a), a plaintiff normally has neither the reason nor the right to appeal the dismissal because the plaintiff has received the relief it requested. *See Parker v. Freightliner Corp.,* 940 F.2d 1019, 1023–24 (7th Cir. 1991); *see also Libbey–Owens–Ford Co. v. Blue Cross and Blue Shield Mut. of Ohio,* 982 F.2d 1031, 1034 (6th Cir.1993). Such a dismissal is appealable only if it legally prejudices the plaintiff by "severely circumscrib[ing] the plaintiff's ability to reinitiate his lawsuit." *Parker,* 940 F.2d at 1023–24. Boland was therefore able to get his case into this court only because the District Court agreed to dismiss his entire action with prejudice—something Boland now argues the District Court should *not* have done.

Boland, in short, wanted an immediate appeal and therefore took a calculated gamble. When presented with the choice of either to bypass intracorporate remedies and march

making demand or taking his case to the Court of Appeals (but with the proviso that if he lost there he could not come back to the District Court), Boland chose the latter. Now that Boland has lost on appeal, he must live with the consequences of his gamble. Interlocutory appeals are available in the federal courts only under limited circumstances, and we cannot indiscriminately allow plaintiffs to manufacture final decisions as a way around the normal interlocutory rules. *See Libbey–Owens–Ford Co.,* 982 F.2d at 1034 ("A limit on the appellant's procedural options is necessary to prevent piecemeal appeals."); *see also* 15A Charles Alan Wright et al., *Federal Practice and Procedure* § 3914.8 (2d ed. 1992) ("[A] dismissal without prejudice that leaves the plaintiff free to reopen the entire case by filing a new action should the challenged ruling be affirmed may likewise seem an undue threat to finality principles, and perhaps an undue interference with the defendant's interest in prompt and final disposition.").

Although courts might bend this doctrine when the choice between complying with the District Court's order and appealing is particularly onerous, Boland's case is not such a situation. *See generally* 15A Wright, *supra,* § 3914.8 ("Some relaxation of the abandonment requirement may be warranted ... if there were strong grounds for challenging the interlocutory order and strong—but not sufficient—arguments that the order should be appealable without requiring manufactured finality."). Complying with the District Court's order and making demand would not have been much to ask of Boland. Making demand on a board is "a relatively costless step" and "imposing this requirement places little burden on the plaintiff." *ALI Principles, supra,* § 7.03 cmt. e. Boland presumably did not want to acquiesce to the District Court's order because *making demand would give the Indiana Financial board a chance to forestall his suit.* In his brief, Boland worries that if demand is required, then "this suit, as a practical matter, is over" because the IBCL "permits the directors wide discretion to terminate such suit." Appellant's Br. at 25 n. 11. Such an right into court. *Cf. Kamen,* 939 F.2d at 462–63.

outcome, however, would hardly be a reason to excuse demand. Indeed, it is the very reason the IBCL encourages demand. If a disinterested committee makes a good faith investigation into Boland's allegations and finds that litigation is not warranted, then this suit, as a policy matter, *should* be over.

Finally, even if Boland's suit had been dismissed on a defendant's Rule 12(b)(6) motion rather than Boland's own Rule 41(a) motion, he still would not be entitled to replead after this court affirmed the dismissal. *See* 3 James Wm. Moore, *Moore's Federal Practice* para. 15.11 (2d ed. 1996) ("Where, although given an opportunity to amend, the pleader has stood upon his pleading and appealed from a judgment of dismissal, amendment will not normally be permitted ... in the trial court if the order of dismissal is affirmed, unless the mandate of the appellate court expressly permits such amendment."). We agree with the First Circuit that "[p]arties who decide not to seek permissive relief in the trial court must clearly understand that they will have an uphill fight ... to convince the court of appeals to consider a request for the relief as a matter of first impression." *The Dartmouth Review v. Dartmouth College,* 889 F.2d 13, 22 n. 9 (1st Cir.1989); *see also Williams v. O'Leary,* 55 F.3d 320, 324 n. 8 (7th Cir.), *cert. denied,* — U.S. ——, 116 S.Ct. 527, 133 L.Ed.2d 434 (1995). Rather than asking the District Court to stay the litigation while he made demand, Boland preferred to "test the appellate waters." *Royal Business Group, Inc. v. Realist, Inc.,* 933 F.2d 1056, 1066 (1st Cir. 1991). In light of the strong policy considerations supporting the demand requirement and the ease with which a shareholder can make demand, we do not think an exception to the normal rule is justified for Boland.[8]

## B. Investment Company Act Claims

■ Turning now to Boland's ICA claims, we agree with the District Court that they should have been pleaded derivatively. The Supreme Court stated in *Kamen* that federal common law for claims under the ICA should generally draw upon state corporation law.[9] *Kamen,* 500 U.S. at 97–99, 111 S.Ct. at 1716–18. More specifically, the Supreme Court said that federal courts should look to the law of the state where the investment company is incorporated. *See id.* at 108–09, 111 S.Ct. at 1722–23. Indiana law generally prohibits a shareholder from "maintain[ing] an action in his or her own name to redress an injury to the corporation." *Knauf Fiber Glass, GMBh v. Stein,* 622 N.E.2d 163, 165 (Ind.1993). But see *Barth,* 659 N.E.2d at 562–63 (allowing some exceptions for closely-held corporations). Those ICA claims, therefore, that attempt to assert the rights of Indiana investment companies should normally be pleaded derivatively.

Boland actually concedes on appeal that he should have pleaded the ICA claims deriva-

---

**8.** It is unclear from Boland's brief whether he is appealing only the Rule 12(b)(6) dismissal of the claims against the individual defendants or whether he is also trying to appeal his own voluntary dismissal of the two breach of contract claims and the claims against Hickory. Assuming that Boland wants to appeal all of the counts and assuming that he may appeal counts he voluntarily dismissed, we find that Boland should have made demand regarding *all* of his common law claims. Boland is therefore barred from repleading any of his claims in District Court.

**9.** Neither the U.S. Supreme Court nor this court has ever explicitly decided whether the ICA creates shareholder causes of action. In *Kamen,* the Supreme Court assumed without deciding that such causes of action exist. *See Kamen,* 500 U.S. at 97 n. 4, 111 S.Ct. at 1717 n. 4; *see also Burks v. Lasker,* 441 U.S. 471, 475–76, 99 S.Ct. 1831, 1835–36, 60 L.Ed.2d 404 (1979). The other courts of appeals, meanwhile, have split regard-

ing whether implied rights of action exist under various sections of the ICA. *Compare Fogel v. Chestnutt,* 668 F.2d 100, 109–112 (2d Cir.1981) (Friendly, J.), *with Brouk v. Managed Funds, Inc.,* 286 F.2d 901, 912 (8th Cir.1961), *vacated as moot by agreement,* 369 U.S. 424, 82 S.Ct. 878, 8 L.Ed.2d 6 (1962). More recent Supreme Court precedent, however, has cast doubt on the type of analysis that courts have used to find implied rights of action. *See Central Bank of Denver v. First Interstate Bank of Denver,* 511 U.S. 164, 184–88, 114 S.Ct. 1439, 1452–53, 128 L.Ed.2d 119 (1994); *Thompson v. Thompson,* 484 U.S. 174, 188–92, 108 S.Ct. 513, 520–23, 98 L.Ed.2d 512 (1988) (Scalia, J., concurring in judgment); *Touche Ross & Co. v. Redington,* 442 U.S. 560, 575–76, 99 S.Ct. 2479, 2488–89, 61 L.Ed.2d 82 (1979). We fortunately need not enter this debate because regardless of whether such rights of action exist, we find that Boland's ICA claims were properly dismissed for other reasons.

tively. He argues, however, that he should be allowed to replead them as derivative because the District Court never gave him a chance to do so. He says that he wanted to replead them but that such an action would have been pointless because the District Court, following Indiana law, would have dismissed the repleaded ICA claims for failure to make demand. As discussed above, however, the District Court was correct to require demand. Boland's failure to replead his ICA claims is therefore not the "fault" of the District Court but rather is the result of his unwillingness to make demand. Just as Boland took a risk that he would lose his common-law claims by appealing rather than making demand, Boland also gambled his ICA claims by refusing to replead them as derivative and make demand on Indiana Financial's board.[10]

The judgment of the District Court is AFFIRMED.

---

10. The defendants have asserted that the District Court's judgment should be affirmed for two other reasons: 1) because Boland's separate suit against Engle, Sampson, and Hickory in Delaware court as a shareholder of a WREIT subsidiary makes him an inadequate derivative plaintiff in this suit, and 2) because many of Boland's claims are barred by the applicable statutes of limitations. In affirming the District Court, however, we reach neither of those issues.