**Patricia C. REIMEL, individually and derivatively as a shareholder of Otter Tail Power Company, Plaintiff,**

v.

**John C. MacFARLANE, et al., Defendants.**

**Civil No. 97–1553(JRT/RLE).**

United States District Court, D. Minnesota.

June 23, 1998.

Samuel E. Heins, Bryan L. Crawford, Stacey L. Mills, Heins, Mills & Olson, Minneapolis, MN, Jay W. Eisenhofer, Stuart M. Grant, Abbott A. Leban, Grant & Eisenhofer, Wilmington, DE, for Plaintiff.

Roger J. Magnuson, David Youngert Trevor, Dorsey & Whitney, Minneapolis, MN, for Defendants.

## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

TUNHEIM, District Judge.

This matter is before the Court on defendants' motion to dismiss this shareholder derivative action on the ground that the plaintiff failed to make a demand on defendant Otter Tail Power Company's ("Otter Tail") board of directors and failed to articulate why she is excused from the demand requirement. In the alternative, defendants move to certify the question of demand futility to the Minnesota Supreme Court. For the reasons set forth below, defendants' motion to dismiss is granted, and plaintiff's claims are dismissed without prejudice.

### BACKGROUND [1]

Otter Tail, a corporation formed under the laws of Minnesota, is a public utility that is also engaged in other lines of business

---

1. For the purposes of deciding this motion, the Court will assume the factual allegations set forth in the Complaint are true.

through subsidiaries. Defendants John C. MacFarlane, Thomas W. Brown, Dayle Dietz, Dennis R. Emmen, Maynard D. Helgaas, Arvid R. Liebe, Kenneth L. Nelson, Nathan I. Partain, and Robert N. Spolum are directors of Otter Tail, and defendants MacFarlane, Richard W. Muehlhausen, Douglas L. Kjellerup, Jay D. Myster, Ward L. Uggerud, and A.E. Anderson are officers of Otter Tail.

As of May 1, 1997, Otter Tail had over eleven million common shares outstanding. These shares are traded actively on the NASDAQ market. Plaintiff Patricia C. Reimel is an owner of an undisclosed number of shares of Otter Tail stock.

On January 27, 1997, Otter Tail adopted a "Shareholder Rights Plan" ("the Plan"). In a news release issued that day, Otter Tail's spokesperson stated that the Plan provides protection against hostile takeovers but disclaimed the existence of any specific takeover bid.

This Plan created a new class of Otter Tail securities, the "Preferred Share Purchase Rights" (the "Rights"). The Rights were declared and became payable as a dividend, one Right per share for each of the outstanding common shares of the company on the record date of February 7, 1997.

The Rights contain a "flip-in" provision, which entitles each holder of a Right to buy $140 worth of Otter Tail shares for $70 upon any number of triggering events relating to the acquisition of fifteen percent or more of Otter Tail's common stock. This provision deters would be acquirers of Otter Tail by threatening to dilute their holdings and greatly increase the number of shares an acquirer would have to purchase in order to consummate a merger, combination, or takeover purchase.

The Rights also contain a "flip-over" feature, providing that, in the event of a hostile takeover or merger, the shareholders may purchase $100 worth of the acquiring company's shares for $50. This feature subjects the acquiring company to a half-price sale of its own stock and thereby dilutes the interest of its other shareholders, obviously deterring potential acquisitions.

Neither the "flip-in" nor "flip-over" provisions—also known individually and collectively as a "poison pill"—apply if an offer for all Otter Tail shares has been approved by a majority of the company's non-officer directors. Also, these rights can be voided by Otter Tail's so-called "Continuing Directors," persons who were members of the Board of Directors on or before January 27, 1997 or successors approved by a majority of the incumbent Continuing Directors.

Finally, the Plan contains a so-called "dead hand" feature, which provides that flip-in or flip-over rights, once exercisable, remain exercisable until January 27, 2007 or until their earlier redemption by a majority of the Continuing Directors. Any redemption is at the option of the Continuing Directors and on such basis and with such conditions as they, in their discretion, may establish.

Plaintiff alleges the dead hand feature serves no purpose other than to discourage future acquisition activities by making proxy contests to replace members of the current board of directors absolutely futile. It disenfranchises shareholders by forcing them to vote for incumbent directors or their designees if they want to be represented by a board entitled to exercise its full prerogatives. In other words, by limiting the power to redeem the poison pill to Continuing Directors, the dead hand severely handicaps future boards to the point of rendering future contests for corporate control prohibitively expensive and effectively impossible. This "entrenches" the incumbent board by preventing the shareholders—who never approved the Rights—from receiving any offer to purchase their shares without the prior approval of the Continuing Directors.

Plaintiff's derivative action seeks to invalidate the Plan as unlawful *per se,* as a whole or to the extent of its dead hand provision. The Complaint also includes claims against the director defendants for breach of fiduciary duty and against the officer defendants for aiding and abetting them. It further states that plaintiff has not made a demand on Otter Tail's board because such a demand would be futile. Specifically, the Complaint alleges a demand would be futile because the entire board approved the Plan, because the director defendants are interested parties and cannot make a truly independent decision whether to commence an action against

themselves, and because the director defendants cannot defend their actions as any type of independent business judgment since their actions were for the purpose of entrenching themselves in their current positions.

At this stage of the litigation, defendants do not dispute that the Plan contains the poison pill and dead hand provisions. They do deny, however, plaintiffs' claim that the Plan was designed to entrench the current directors, and they contend their actions were a legitimate exercise of business judgment. Finally, defendants reject plaintiffs' futility allegations as conclusory and insufficient and argue, to the contrary, that such a demand would not be futile in this context.

## ANALYSIS

Federal Rule of Civil Procedure 23.1 requires that, in a derivative action brought by a shareholder to enforce a right of a corporation, the complaint allege with particularity "the efforts, if any, made by the plaintiff to obtain the action plaintiff desires from the directors or comparable authority and ... the reasons for plaintiff's failure to obtain the action or for not making the effort." Because there is no dispute that plaintiff failed to make a demand upon the Otter Tail board, the issue in this case is whether such a demand is excused under Minnesota law.[2]

In Minnesota and elsewhere, demand is excused if it would be futile. *See, e.g., Winter v. Farmers Educ. and Co-op. Union,* 259 Minn. 257, 107 N.W.2d 226, 233–34 (1961); *Aronson v. Lewis,* 473 A.2d 805, 814 (Del.1984). Courts in some jurisdictions have outlined clear prerequisites for finding futility. For example, Delaware courts excuse demand as futile where factual allegations in a complaint create a reasonable doubt that either 1) the majority of the corporation's board was disinterested in the transaction or independent, or 2) the challenged transaction was otherwise the result of a valid exercise of business judgment. *See, e.g., Aronson,* 473 A.2d at 814–17; *see also Professional Management Assocs., Inc.*

*v. Coss,* 574 N.W.2d 107, 110–11 (Minn.Ct. App.1998) (applying Delaware law). At least one Delaware court has determined that allegations of directors' perpetuating themselves in office is sufficient to satisfy the *Aronson* test. *See In re Chrysler Corp. Shareholders Litig.,* Civ. A. No. 11873, 1992 WL 181024 at *4–5 (Del.Ch. July 27, 1992).

The Minnesota Supreme Court has yet to define clearly the parameters of demand futility. It last addressed this principle in *Winter, supra,* in which it offered the following analysis:

> In connection with the defendant Erp's contention that the demand upon the managing directors and shareholders is a prerequisite to the commencement of an action of this nature, it may be conceded that the corporation alone has standing to sue both insiders and outsiders for actionable wrongs committed against it. Ordinarily a demand should be made on the board of directors unless the wrongdoers constitute a majority of the board .... The derivative suit is recognized as an extraordinary remedy available to the shareholder as the corporation's representative only when there is "no other road to redress." The demand upon managing directors and shareholders is important in that it gives the management of the corporation an opportunity to consider the merits of the dispute and determine, in the interests of the corporation and shareholders, whether it might be disposed of without the expense and delay of litigation. The demand requirement as a condition precedent to a shareholder's derivative suit is one not lightly to be dispensed with.

107 N.W.2d at 233 (footnotes and citations omitted). The court went on to find that, in view of the loose, informal character of the corporation's control structure in that case, it would be unrealistic to require the same demand for corporate action as would be expected in the context of the ordinary business corporation.[3] *Id.* at 233–34. In so holding, the Court noted that "such demand is

---

**2.** The parties agree that Minnesota law governs the demand requirement because Otter Tail is a Minnesota corporation.

**3.** The court also found that raising the issues in controversy would be useless because these mat-

ters had already been discussed with various members of the board, to no avail. *See id.* 107 N.W.2d at 233.

not required where it is plain from the circumstances that it would be futile." *Id.* at 234.

Research has revealed no Minnesota decision analyzing or applying *Winter*'s teaching on this issue. Moreover, although Minnesota courts have followed Delaware corporate law in other contexts, no court has stated that Delaware's approach to the demand futility principle should be followed here.

■ Left to interpret *Winter* without guidance from other Minnesota courts, this Court concludes that requiring demand in the circumstances of this case is consistent with the Minnesota Supreme Court's approach. *Winter*'s predominant message is that a shareholder derivative suit is a last resort, available only where—as in that case—there is no possibility that the board will consider the merits of the demand. *See id.* at 233–34.

Here, the allegations of futility set forth in the Complaint are insufficient to convince the Court that demand would be futile. While the Court agrees with plaintiff that the director defendants probably would not authorize a lawsuit against themselves, *Winter*'s discussion clearly indicates that demand serves other purposes. In particular, demand provides the board with an opportunity to resolve the dispute without resorting to litigation. *See id.* at 233.[4] The director defendants' mere adoption of the Plan does not lead unequivocally to the conclusion that Otter Tail's board would refuse to consider whether this controversy "might be disposed of without the expense and delay of litigation." On the contrary, these board members—whether they originally intended to entrench themselves or adopted the Plan in a good faith attempt to prevent a hostile takeover—may now be willing to revisit their previous actions and resolve this dispute through alternative means.[5] No factual allegation in the Complaint (even when assumed to be true) establishes otherwise.

■ The Court disagrees with plaintiff that *Winter* stands for the proposition that whenever the alleged wrongdoers constitute a majority of the board, demand is futile *per se*. Although the *Winter* court did state that "a demand should be made on the board of directors unless the wrongdoers constitute a majority of the board," it did not declare that demand is *always* futile when the alleged wrongdoers are a majority, regardless of the particular circumstances of the case. *See id.* Such an interpretation ignores the remainder of *Winter*'s discussion, which indicates that demand is excused only if there is no possibility that it could lead to a resolution and suggests that a court should analyze the particular circumstances of the case before it in making a futility determination. *See id.*

■ Certainly, in cases involving allegations of patently egregious board conduct such as converting corporate funds or self-dealing, demand almost always would be futile.[6] However, in this case, where the offending board actions may have been in good faith or, even if not, potentially may be cured or corrected through other means, a demand

4. Other courts and authorities support the view that one purpose of the demand requirement is to provide corporate management with an opportunity to address and resolve disputes and shareholder complaints prior to resorting to litigation. *See, e.g., Boland v. Engle,* 113 F.3d 706, 712–13 (7th Cir.1997) (stating that demand serves as a valuable screen of potential lawsuits by giving corporations the opportunity to resolve complaints before litigation); *Kaufman v. Kansas Gas & Elec. Co.,* 634 F.Supp. 1573, 1577 (D.Kan. 1986) (indicating the demand requirement is a form of alternative dispute resolution providing corporate management with the opportunity to pursue alternative remedies); *Principles of Corporate Governance,* § 7.03 cmt. c (1992) (setting forth a number of purposes for the demand requirement, including the court's avoiding unnecessarily hearing a case that may be mooted by subsequent court action and providing an opportunity for the board to determine if it will pursue

other remedies or take corrective actions). In addition, it is worth noting that the trend in statutory and case law appears to be towards narrowing or eliminating the exceptions to the demand requirement. *See Boland,* 113 F.3d at 712 (citing cases and authorities).

5. Based on this analysis, the Court need not decide at this stage of the litigation whether Otter Tail's poison pill or dead hand provisions are invalid under Minnesota law. Likewise, the Court need not consider whether adoption of the Plan was a legitimate exercise of business judgment.

6. The two futility cases cited in *Winter* and relied on by plaintiff involved the misappropriation of corporate funds by board or council members. *See Grudnosky v. Bislow,* 251 Minn. 496, 88 N.W.2d 847, 852 (1958); *Rothwell v. Robinson,* 39 Minn. 1, 38 N.W. 772, 773 (1888).

on the wrongdoers could lead to a non-litigated resolution of the dispute.

Finally, the Court refuses to adopt blindly Delaware's test for futility while ignoring the circumstances of this case and the teaching of *Winter*. There is no reason to engage in a mechanical application of Delaware law (and likely find that demand is futile) where the realities of this case suggest that the board's response to a shareholder demand is not preordained.[7] Because futility is not "plain from the circumstances," plaintiff must make a demand on the board before bringing a derivative action against defendants.

## ORDER

Based on the foregoing, and all of the records, files, and proceedings herein, **IT IS HEREBY ORDERED**:

1. Defendants' motion to dismiss [Docket No. 8] is **GRANTED**.

2. Plaintiffs' claims are **DISMISSED WITHOUT PREJUDICE**.

3. Defendants' motion to certify the question to the Minnesota Supreme Court [Docket No. 8] is **DENIED AS MOOT**.

LET JUDGMENT BE ENTERED ACCORDINGLY.

---

7. The Court agrees with plaintiff that Minnesota courts often look to Delaware law for assistance in developing rules of corporate law. Nevertheless, the Court will not adhere to the test articulated by the Delaware courts because, at least in this context, that approach would be at odds with general principles of Minnesota law set forth in *Winter*.