# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| IN RE WEWORK LITIGATION | ) ) ) ) ) | Consolidated C.A. No. 2020-0258-AGB |

# OPINION

Date Submitted: August 18, 2020
Date Decided: August 21, 2020

William B. Chandler III, Brad D. Sorrels, Lori W. Will, Lindsay Kwoka Faccenda, Leah E. Brenner, and Jeremy W. Gagas, WILSON SONSINI GOODRICH & ROSATI, P.C., Wilmington, Delaware; Michael S. Sommer, WILSON SONSINI GOODRICH & ROSATI, P.C., New York, New York; David J. Berger, Steven M. Guggenheim, and Dylan G. Savage, WILSON SONSINI GOODRICH & ROSATI, P.C., Palo Alto, California; *Attorneys for Plaintiff The We Company.*

William M. Lafferty, Kevin M. Coen, Sabrina M. Hendershot, and Sara Toscano, MORRIS NICHOLS ARSHT & TUNNELL LLP, Wilmington, Delaware; Eric Seiler, Philippe Adler, and Mala Ahuja Harker, FRIEDMAN KAPLAN SEILER & ADELMAN LLP, New York, New York; William Christopher Carmody, Shawn J. Rabin, and Arun Subramanian, SUSMAN GODFREY L.L.P., New York, New York; *Attorneys for Plaintiffs Adam Neumann and We Holdings LLC*.

Robert S. Saunders and Sarah R. Martin, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware; George A. Zimmerman, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, New York, New York; *Attorneys for The We Company.*

Elena C. Norman, Rolin P. Bissell, and Nicholas J. Rohrer, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Erik J. Olson, MORRISON & FOERSTER LLP, Palo Alto, California; James Bennett and Jordan Eth, MORRISON & FOERSTER LLP, San Francisco, California; *Attorneys for Defendant SoftBank Group Corp.*

Michael A. Barlow and E. Wade Houston, ABRAMS & BAYLISS LLP, Wilmington, Delaware; John B. Quinn and Molly Stephens, QUINN EMANUEL URQUHART & SULLIVAN, LLP, Los Angeles, California; *Attorneys for Defendant SoftBank Vision Fund (AIV M1) L.P.*

**BOUCHARD, Chancellor**

This decision resolves a discovery dispute that implicates an issue of first impression: Does management of a Delaware corporation have the authority to unilaterally preclude a director of the corporation from obtaining the corporation's privileged information? In my opinion, the answer to this question is no.

The dispute in this case concerns obtaining access to certain privileged communications among management of The We Company (the "Company"), its in-house counsel, and its outside counsel, Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden"). A special committee of the Company's board of directors formed in October 2019 (the "Special Committee") seeks this information for the purpose of opposing the Company's motion under Court of Chancery Rule 41(a) for leave to voluntarily dismiss the complaint in this action that the Company, acting by and under the direction of the Special Committee, filed against SoftBank Group Corp. ("SoftBank") and SoftBank Vision Fund (AIV M1) L.P. ("Vision Fund") on April 7, 2020. That complaint alleges that SoftBank and Vision Fund breached contractual obligations they owed to the Company to use reasonable best efforts to purchase up to $3 billion of the Company's stock in a tender offer.

The Rule 41 motion was brought at the direction of a new committee of the Company's board of directors consisting of two temporary directors that was formed on May 29, 2020 (the "New Committee"). The New Committee was formed six weeks after the putative controlling stockholder of the Company and the key target

1

of this litigation—SoftBank—asked the Company's board of directors to confirm that the Special Committee did not have the authority to pursue the litigation on behalf of the Company.

To be clear, the Special Committee does not seek any privileged communications between the New Committee and its counsel. The issue here concerns access to the *Company's* privileged information relating to the circumstances under which the New Committee was established and how it may have been influenced by the Company's management ("Management"), the Chief Executive Officer of which was chosen by SoftBank. For the reasons explained below, the court concludes that the members of the Special Committee are entitled to discovery of these privileged communications.

## I. BACKGROUND

Unless otherwise noted, the facts recited in this opinion are based on the allegations of The We Company's Verified Complaint (the "Complaint") and submissions of the parties, including documents incorporated therein, leading up to the present dispute.

## A. The Special Committee and the MTA

On October 11, 2019, SoftBank proposed a series of transactions to help ease a liquidity crisis at the Company.[1] The proposal included, among other things, corporate governance changes, a tender offer by SoftBank for equity of the Company, and a debt financing arrangement.[2]

On October 12, 2019 the Company's board of directors (the "Board") met and established the Special Committee consisting of Bruce Dunlevie and Lewis Frankfort to evaluate a potential transaction with SoftBank. The resolutions forming the Special Committee provided that the proposed transactions "if fully consummated, would result in SoftBank acquiring majority economic ownership and voting control of the Company."[3] The resolutions define "SoftBank" to mean SoftBank Group Corp., Vision Fund, and one or more of their affiliates, collectively.[4] In forming the Special Committee, the Board determined that both Dunlevie and Frankfort were "free of any material conflict of interest relating to a Potential Transaction, SoftBank and Adam Neumann."[5]

---

[1] Verified Compl. ("Compl.") ¶ 37 (Dkt. 1); Mot. for Status Quo Order ("Status Quo Mot.") Ex. C, (Disclosures sent to the Company's stockholders in connection with the MTA) at 17, 21-22 (Dkt. 75).

[2] Status Quo Mot. Ex. C, at 17.

[3] Status Quo Mot. Ex. A, Annex A (Oct. 12, 2019 Resolutions), at 1.

[4] *Id.*

[5] *Id.*

Over the next ten days or so, the Special Committee negotiated what became the Master Transaction Agreement ("MTA"). The MTA, which was signed on October 22, 2019, provided for essentially three immediate governance changes to the Company, which were memorialized in an amended and restated stockholders' agreement on October 30, 2019:

- SoftBank and Vision Fund have the right to designate five of the Company's ten directors;[6]

- SoftBank has the right to designate one of its directors as executive chairman of the Board;[7] and

- Adam Neumann will execute a proxy giving voting control of his super-voting founder shares to the Board.[8]

The MTA also contemplated several transactions, including a $3 billion tender offer for stock of the Company to be completed by SoftBank subject to certain closing conditions, which would expire on April 1, 2020 (the "Tender Offer").[9]

On April 1, 2020, SoftBank terminated the Tender Offer, asserting that certain closing conditions to the Tender Offer were not satisfied.[10]

---

[6] Compl. Ex. A. ("MTA"), Ex. I (Stockholders' Agreement) § 2.01(b)(ii). These five directors may be appointed by Vision Fund or SoftBank, provided that at least one is designated by Vision Fund. *Id.*

[7] *Id.* § 2.01(b)(v).

[8] *Id.* § 5.08.

[9] MTA § 3.01(a).

[10] Compl. Ex. C.

On April 7, 2020, the Special Committee filed this action on behalf of the Company against SoftBank and Vision Fund.[11] The Complaint asserts two claims. Count I asserts a breach of contract claim under the MTA. Specifically, the Special Committee asserts that SoftBank and Vision Fund breached their obligation to use reasonable best efforts to consummate the transactions contemplated by the MTA by preventing the satisfaction of one of the closing conditions to the Tender Offer.[12] Count II asserts a breach of fiduciary duty claim against SoftBank and Vision Fund as the Company's controlling stockholders for "intentionally breaching a contract with the Company in order to advance its own interests and harm the interests of the minority stockholders and . . . repeatedly using its contract rights, board control and influence to benefit itself, narrow and diminish the Company's options, and harm its minority stockholders."[13]

On May 4, 2020, Adam Neumann and We Holdings LLC filed their own complaint against SoftBank and Vision Fund asserting similar claims. That action was consolidated with the Special Committee's action on May 18, while maintaining separate pleadings for the different plaintiffs.[14]

---

[11] Compl.

[12] *Id.* ¶¶ 92, 94.

[13] *Id.* ¶ 101.

[14] *See* Dkt. 109.

## B.    The Competing Letters to the Board

On April 17, 2020, SoftBank and Vision Fund moved to dismiss the Complaint. The same day, SoftBank sent a letter to the Board asserting that the Special Committee should not be permitted to continue this litigation in the name of the Company because each of its members "faces material, disabling conflicts between their personal financial desire to reduce their stake in WeWork by selling their shares to [SoftBank in the Tender Offer] and the separate interests of WeWork."[15] SoftBank recommended that the Board confirm that the Special Committee is not authorized to act on behalf of the Company in this lawsuit.[16]

On April 20, 2020, the Special Committee responded with its own letter to the Board, maintaining that it did not have a disabling conflict preventing it from continuing the litigation and saying that every other member of the Board had a conflict of interest.[17] The Special Committee further contended that it had the proper authority to continue the litigation, citing various provisions in the MTA, disclosures sent to the Company's stockholders in connection with the MTA, and the Board resolutions forming the Special Committee.[18] This decision refers to SoftBank's

---

[15] Status Quo Mot. Ex. D ("SoftBank Letter"), at 1.

[16] *Id.* at 3.

[17] Status Quo Mot. Ex. E ("Special Comm. Letter").

[18] *Id.*

6

April 17 letter and the Special Committee's April 20 letter, together, as the "Competing Letters."

When the Competing Letters were sent, the Board consisted of eight directors, including four SoftBank designees and the two Special Committee members.[19] The Company's CEO, Sandeep Mathrani, serves on the Board as a SoftBank designated director.[20]

On April 29, 2020, the Board met and, by a vote of 6-2 (with the Special Committee members voting against), authorized Management to engage an executive search firm to identify two candidates for appointment to the Board on a temporary basis.[21] On May 5, Skadden confirmed in an email that the purpose of adding these directors would be to form a new committee to address "the proper scope of the Special Committee's authority and the pending litigation."[22] In that same email, Skadden explained that, "at the meeting of the Board on April 29, 2020, all directors acknowledged that they had a conflict regarding the disputes presented in the [Competing Letters]."[23]

---

[19] Status Quo Mot. ¶ 17 (Dkt. 55); *id.* Ex. C, at 1-2.

[20] Status Quo Mot. ¶ 17 (citations omitted); Adam Neumann and We Holdings LLC First Am. Verified Compl. ¶ 20 (Dkt. 131).

[21] Status Quo Mot. ¶ 18; Frankfort Decl. ¶ 13 (Dkt. 55).

[22] Status Quo Mot. Ex. G, at 2.

[23] *Id.*

The Special Committee requested information regarding the steps taken to identify these new directors and Management's discussions concerning this process, including documents between Skadden and Management.[24]  Skadden refused to produce any such documents, contending they were "either ministerial or protected by the attorney-client and work product privileges."[25]

## C.    The Status Quo Motion

On May 11, 2020, the Special Committee filed a motion for entry of a status quo order to prevent the Board from forming a committee to review the authority of the Special Committee, taking any action to terminate or limit the authority of the Special Committee, or entering into any agreement or understanding resolving the disputes between the Company, its stockholders, and SoftBank, pending the court's decision on the motions to dismiss, which were being briefed.[26]  The Special Committee asserted that SoftBank controlled the Board and it had reason to believe the result of the process being undertaken to form a new, temporary committee was "preordained."[27]  The Special Committee also contended that the Board's actions "to limit the Committee's authority over the litigation" not only violated "the clear terms

---

[24] *Id.* at 1-2.

[25] *Id.* at 2.

[26] Proposed Order Maintaining the Status Quo (Dkt. 55).

[27] Status Quo Mot. Special Comm. Reply Br. ¶ 15 (Dkt. 98).

of the MTA and the Resolutions forming the Committee," but were also "entirely unfair to minority stockholders."[28]

On May 19, 2020, SoftBank and Vision Fund filed their opposition papers.[29] That same day, Management, through Skadden, filed its own opposition to the Special Committee's motion.[30] Management took no position on the positions advanced in the Competing Letters but asserted that the Board should not be prevented from "appoint[ing] disinterested and independent directors to determine" whether "the Special Committee *should* have authority to pursue this litigation on behalf of the Company."[31] According to Management, the Competing Letters raised "critical issues for the governance of the Company, but every current director is conflicted."[32] Thus, as Management informed the court, at its recommendation, the Board discussed appointing new "disinterested and independent directors and empower[ing] them as a committee to address the issue" because that process is a

---

[28] *Id.* ¶ 8.

[29] Status Quo Mot. SoftBank Opp'n Br. (Dkt. 93); Status Quo Mot. Vision Fund Opp'n Br. (Dkt. 94).

[30] Status Quo Mot. Management Opp'n Br. (Dkt. 92). At the August 18, 2020 hearing, Skadden represented it "take[s] direction from the management of the company: the CEO, the chief legal officer. . . ." Motion to Compel and Requested Rule 41 Motion Discovery Hr'g Tr. ("Aug. 18 Hr'g Tr.") at 6.

[31] Status Quo Mot. Management Opp'n Br. ¶¶ 11, 15.

[32] *Id.* ¶ 2.

"well-recognized path for Delaware corporations to resolve a dispute when all directors are conflicted."[33]

On May 27, 2020, the court denied the Special Committee's motion for the entry of a status quo order "without prejudice to its ability to seek relief in the future depending on how the situation unfolds."[34] The court stressed that "if a new committee is appointed and if that committee reaches a conclusion that the Special Committee takes issue with, the Special Committee will be free at that time to challenge any action taken, at which point the Court would have a concrete set of facts with which to then consider the merits of any renewed application."[35]

### D. The New Committee

On May 29, 2020, an executive search firm presented two candidates to the Board: Alex Dimitrief and Fred Arnold.[36] That same day, the Board resolved that Dimitrief and Arnold were appointed as directors and then appointed them to a newly created committee (as defined above, the "New Committee") that was empowered to determine "whether the Special Committee has or should have, in the best interests of the Company and its stockholders, the authority to cause the Company to

---

[33] *Id.* ¶ 3.

[34] Motion for Entry of a Status Quo Order Hr'g Tr. at 74 (May 27, 2020) (Dkt. 129).

[35] *Id.* at 73.

[36] Rule 41 Mot., Ex. D (New Committee Report), at 21 (Dkt. 204).

10

commence and/or continue the MTA Litigation."[37] The Board further resolved that it "desires to establish a specific term of the New Committee's existence" and determined that the New Committee would exist for a two-month term automatically expiring on July 29, 2020, for which they would each receive $250,000.[38]

The New Committee engaged its own counsel and investigated the issues raised by the Competing Letters.[39] On July 28, 2020, the day before it disbanded, the New Committee delivered its report to the Board and unanimously resolved that "for the reasons detailed in the Report, the Special Committee did not have authority to initiate the MTA Litigation or Similar Litigation, does not presently have authority to maintain the MTA Litigation or Similar Litigation, and should not have the authority to continue the MTA Litigation or commence Similar Litigation."[40] The New Committee directed the Company's legal department to "instruct the Company's counsel to file promptly a motion on behalf of the Company for leave to dismiss the MTA Litigation without prejudice pursuant to Delaware Court of Chancery Rule 41(a)."[41]

---

[37] Rule 41 Mot. ¶ 9.

[38] Rule 41 Mot., Ex. B (May 29, 2020 Resolutions), at 2; Special Comm. Opp'n Br. 10 (Dkt. 248).

[39] Rule 41 Mot. ¶ 11.

[40] *Id.*; *id.* Ex. C (July 28, 2020 Resolutions), at 1; Special Comm. Opp'n Br. 10.

[41] Rule 41 Mot. ¶ 11; *id.* Ex. C, at 1.

11

On July 30, 2020, Management filed its motion seeking leave to file an executed stipulation of dismissal of the Complaint without prejudice under Court of Chancery Rule 41.[42]

### E.     The Proposed Discovery

The Special Committee intends to oppose the Rule 41 motion and seeks discovery for that purpose, including "[d]ocuments and communications from The We Company (as well as Skadden Arps or any other Company representative) regarding," among other things, "[t]he decision to form a New Committee, including relating to who was involved in or consulted about that decision and how it was determined that the New Committee would exist for a limited time."[43]   These categories entail privileged discussions among Management, Company in-house counsel, and Company outside counsel.  The Special Committee also seeks three-hour depositions to depose five individuals:  the two members of the New Committee, the Company's CEO (Sandeep Mathrani), its Chief Legal Officer (Jen Berrent), and a Skadden attorney (Graham Robinson).[44]

---

[42] Rule 41 Mot.

[43] Dkt. 227, Ex. 1.

[44] Special Comm. Opp'n Br. 12.  The request to depose the members of the New Committee is unopposed.

12

## II.     THE PARTIES' CONTENTIONS

Management opposes the Special Committee's requested discovery to the extent it seeks "document and deposition discovery of privileged communications involving management, in-house counsel and outside counsel."[45] More specifically, it asks the court to "(1) deny the Special Committee's request for privileged information from April 17, 2020 to the present, and (2) deny the Special Committee's requests for depositions of Sandeep Mathrani, Jen Berrent and Graham Robinson."[46]

Management does so on the theory that the Special Committee was and is adverse to the Company, and the Special Committee "could not have reasonably expected it would have access to advice from Company counsel, nor did it seek that advice."[47] It further contends that "management was entitled to deliberate – and receive legal advice – in confidence and without having to share that advice with the director[s] whose interests are adverse."[48]

The Special Committee advances essentially two arguments in response. First, the Special Committee contends that Management's claim that it can "shield

---

[45] Management Opening Br. 2, 13 (Dkt. 238).

[46] *Id*. 22.

[47] Management Reply Br. 11 (Dkt. 251).

[48] Management Opening Br. 13 (alteration in original) (internal quotation marks and citation omitted).

13

Company privileged information from the entire Board" inverts Delaware law's oversight structure, which provides that "[t]he Board—not management—is responsible for overseeing the affairs of the corporation under 8 *Del. C.* §141(a)," and is inconsistent with "the general rule that a corporation cannot deny a director access to legal advice furnished during the director's tenure."[49]

Second, the Special Committee vehemently disagrees with the assertion that it is adverse to the Company. According to the Special Committee, it "never placed itself opposite the Company, unless the Company is conflated with SoftBank and the directors it controls" because it "sought to prevent the SoftBank-controlled directors on the Board from undertaking a sham process to undermine its authority to pursue this lawsuit on the Company's behalf against SoftBank."[50] Because they are not adverse to the Company, the Special Committee asserts that they are to "'be treated as a joint client when legal advice is rendered to the corporation through one of its officers or directors'" and "[a]s joint clients, they are entitled to privileged information."[51]

---

[49] Special Comm. Opp'n Br. 13-14 (citing *Kalisman v. Friedman*, 2013 WL 1668205, at *4 (Del. Ch. Apr. 17, 2013)).

[50] *Id.* 15, 16 (quoting Management Opening Br. 14).

[51] *Id.* 1 (internal quotation omitted).

14

## III. ANALYSIS

As Management acknowledges: "Directors of Delaware corporations are generally entitled to share in legal advice the corporation receives."[52] Vice Chancellor Laster elaborated on this fundamental principle of Delaware law in *Kalisman v. Friedman*,[53] where he summarized a director's right of access to the corporation's information, including privileged information, as follows:

> A director's right to information is essentially unfettered in nature. The right includes equal access to board information. A company cannot pick and choose which directors will receive which information. The director's right to information extends to privileged material. As a general rule, a corporation cannot assert the privilege to deny a director access to legal advice furnished to the board during the director's tenure. The rationale for this rule is that all directors are responsible for the proper management of the corporation, and thus, should be treated as a joint client when legal advice is rendered to the corporation through one of its officers or directors.[54]

Vice Chancellor Laster then identified the following "three recognized limitations on a director's ability to access privileged information":

> First, the director's right can be diminished by an ex ante agreement among the contracting parties . . . .
>
> Second, a board can act pursuant to 8 *Del. C.* § 141(c) and openly with the knowledge of the excluded director to appoint a special committee. A committee would be free to retain separate legal counsel, and its communications with that counsel would be properly protected, at least to the extent necessary for the committee's ongoing work, such as

---

[52] Management Opening Br. 12.

[53] 2013 WL 1668205.

[54] *Id.* at *3-4 (internal quotation marks and citations omitted).

conducting a special committee investigation or negotiating an interested transaction . . . .

Third, a board or a committee can withhold privileged information once sufficient adversity exists between the director and the corporation such that the director could no longer have a reasonable expectation that he was a client of the board's counsel.[55]

The third limitation is the only one asserted here. According to Management, the Special Committee was on notice when it received SoftBank's April 17 letter that "the Special Committee was adverse to the Company with respect to the issues raised in that letter."[56] This adversity, the argument goes, was confirmed by the Special Committee "huddling with its own separate counsel, not seeking advice from Company in-house or outside counsel, and sending its own letter to the Board threatening the Company with 'considerable liability.'"[57]

As an initial matter, the third limitation identified in *Kalisman*—which refers to the "*board or a committee*" withholding privileged information from a director because of the director's adversity to the corporation—does not apply here by its plain terms.[58] Unlike in the cases on which the parties rely,[59] the Company's

---

[55] *Id.* at *4-5.

[56] Management Reply Br. 7.

[57] *Id.*

[58] *Kalisman*, 2013 WL 1668205, at *5 (emphasis added).

[59] *See SBC Interactive, Inc. v. Corporate Media P'rs*, 1997 WL 770715, at *3 (Del. Ch. Dec. 9, 1997) (all general partners other than SBC asserted privilege against SBC because it was adverse); *Kalisman*, 2013 WL 1668205, at *1, *5 (members of the board of directors other than Kalisman asserted privilege against Kalisman because he was adverse); *In re*

16

governing body—the Board—made no decision to withhold the Company's privileged information from the Special Committee after analyzing whether those directors had a "reasonable expectation that [they were] a client of the board's counsel."[60]  Rather, as discussed further below, Management made that decision unilaterally.

Management's assertion that the Competing Letters demonstrate the Special Committee's adversity *to the Company* is far from clear.  Fairly read, those letters appear to reflect a dispute between the Special Committee and SoftBank, both of which contend that the other is motivated by self-interest,[61] and not a dispute between the Special Committee and the Company.  As to Management's assertion that the Special Committee threatened the Company with liability, the apparent target of the Special Committee's letter was the directors affiliated with SoftBank— not the Company, although it stands to reason the Company could have indemnity

*CBS Corp. Litig.*, 2018 WL 3414163, at *4 (Del. Ch. July 13, 2018) (members of the board of directors not affiliated with the controller asserted privilege against the directors affiliated with the controller because they were adverse).

[60] *Kalisman*, 2013 WL 1668205, at *5.

[61] SoftBank contends the Special Committee members have a disabling interest in using corporate funds to press claims against SoftBank on behalf of the Company because of "their personal desire to reduce their stake in WeWork by selling their shares to [SoftBank in the Tender Offer]."  SoftBank Letter at 1.  The Special Committee contends SoftBank is questioning its corporate authority "not out of concern for the Company, but because of its own desire to end this litigation and thereby avoid the likelihood of significant liability."  Special Comm. Letter at 5-6.

obligations if any of its directors were found liable.[62] According to the Special Committee, furthermore, Management's determination that the Special Committee is adverse to the Company by pressing this litigation against SoftBank and Vision Fund is rich in irony since, it contends, it was urged to file this lawsuit by the Company's counsel in the first place.[63]

Whether or not the question of adversity in this case is a close call or even a legitimate issue, the dispute before the court implicates a novel question under Delaware law: Does management of a Delaware corporation have the authority to unilaterally preclude a director of the corporation from obtaining the corporation's privileged information? No party has identified any authority addressing this question.

---

[62] Special Comm. Letter at 1 ("Should the SoftBank-controlled or affiliated directors on the Company's Board follow the 'recommendations' set forth in Mr. Olson's letter, *they* would risk subjecting themselves and the Company to considerable liability as well as other types of damage.") (emphasis added); *id.* at 7 ("Such efforts will expose the Board—and, in particular those directors who are affiliated with SoftBank or who are deemed to lack independence from SoftBank—to the risk of substantial personal liability.").

[63] Status and Scheduling Conf. Tr. at 13 (Aug. 4, 2020) ("Mr. Robinson from Skadden Arps urged, insisted, that our committee bring litigation to enforce the contract by its terms against SoftBank on behalf of the company. The drafter of the resolutions urged our committee. In fact, he called our committee members separately and lobbied them to bring the litigation to enforce the MTA according to its terms."); Aug. 18 Hr'g Tr. at 33 ("Mr. Robinson has been continuously supportive of the special committee's authority to pursue this very litigation, including reviewing the complaint, including lobbying both members of our committee: You need to bring this lawsuit. . . .").

According to Management, the Competing Letters raised "critical issues for the governance of the Company, *but every current director is conflicted*" and it was the fact that "*all directors are conflicted*" that spurred the appointment of the New Committee.[64] In that situation, Management contends, the entire Board is not entitled to access privileged information because "Company management, stuck between two factions of the Board, needs to be able to seek and receive advice from its own counsel."[65]

In my opinion, this position cannot be squared with the natural order of Delaware corporate law. It is a "cardinal precept" of Delaware law that "the business and affairs of a corporation . . . shall be managed by or under the direction of a board of directors . . . ."[66] It is because "directors are responsible for the proper management of the corporation" that they should "be treated as a joint client when legal advice is rendered to the corporation through one of its directors or officers."[67] It is the board of directors of a corporation—not management—that has the ultimate responsibility for overseeing the affairs of the corporation under 8 *Del. C.* § 141(a). In claiming the right to shield Company privileged information from the entire Board, Management turns these bedrock principles of Delaware law on their head.

---

[64] Status Quo Mot. Management Opp'n Br. ¶¶ 2, 3.

[65] Management Opening Br. 17.

[66] *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984) (quoting 8 *Del. C.* § 141(a)).

[67] *Kalisman*, 2013 WL 1668205, at *4.

Management cautions that sharing privileged communications with both factions of the Board would create "a disincentive for Company management to communicate with its counsel based on the fear that such communications would subsequently be disclosed to both SoftBank *and* the Special Committee."[68] Under the oversight structure of Delaware law, these concerns must give way to the ultimate authority of the board of directors. Management concedes as much in attempting to defend its position when it acknowledges: "The Board could, if it wished, direct management to disclose its privileged communications."[69]

Analytically, this defense runs counter to Management's asserted need to deliberate with counsel separately from competing factions of the Board. More fundamentally, the defense betrays the reality underlying the position of Management, which is led by a Chief Executive Officer chosen by SoftBank whose "independence for purposes of evaluating matters that implicate the interests of a controller" is suspect "[u]nder the great weight of Delaware precedent."[70] Management knows full well that the SoftBank faction of the Board, which is adverse to the Special Committee, would have no reason to override a management

---

[68] Management Opening Br. 17.

[69] Management Reply Br. 3; *see also* Aug. 18 Hr'g Tr. at 16-17 ("the board could always make the decision to waive the privilege.").

[70] *In re EZCORP Inc. Consulting Agreement Deriv. Litig.*, 2016 WL 301245, at *35 (Del. Ch. Jan. 25, 2016) (collecting authorities).

decision beneficial to SoftBank. It is only the minority faction of the Board comprising the Special Committee that has a need for the privileged information at issue here to test the *bona fides* of the New Committee process that SoftBank ostensibly put in motion.

To summarize, this decision holds, under basic principles of Delaware law, that directors of a Delaware corporation are presumptively entitled to obtain the corporation's privileged information as a joint client of the corporation and any curtailment of that right cannot be imposed unilaterally by corporate management untethered from the oversight and ultimate authority of the corporation's board of directors. Accordingly, the Special Committee is entitled to receive the privileged information of the Company it is has requested, which, to repeat, does not concern privileged communications between the New Committee and its own counsel.

## IV. CONCLUSION

For the reasons explained above, the Company is directed to produce to the Special Committee the privileged information described in its document request[71] and to make Mathrani, Berrent, and Robinson available for depositions.

**IT IS SO ORDERED.**

---

[71] Dkt. 227, Ex. 1.

21